# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

JAMES HANNA,                                  :

              Petitioner,

        -vs-

TODD ISHEE, Warden,

              Respondent.          :

Case No. 1:03-cv-801

District Judge Thomas M. Rose
Magistrate Judge Michael R. Merz

---

## REPORT AND RECOMMENDATIONS

This is a habeas corpus action brought by Petitioner James Hanna pursuant to 28 U.S.C. § 2254 and seeking relief from both his conviction for aggravated murder with death specifications and his resulting death sentence.

Mr. Hanna is represented in this proceeding by counsel appointed pursuant to 21 U.S.C. § 848(q).

### Statement of Facts

The Supreme Court of Ohio described the facts and circumstances leading to Mr. Hanna's indictment, trial, convictions, and adjudged sentence of death as follows:

> Appellant and Peter Copas were cellmates for four days at the Lebanon Correctional Institution ("LCI"). In the early morning on August 22, 1997, appellant thrust a sharpened paintbrush into Copas's right eye socket. Appellant also hit Copas in the head with a padlock placed in a sock. The paintbrush penetrated the cranial cavity and entered the brain stem. Surgeons removed the paintbrush lodged in Copas's brain; however, Copas died on September 10, 1997.

Appellant was convicted by a jury of the aggravated murder of Copas and sentenced to death. Appellant directly appeals as a matter of right to this court, challenging his convictions and death sentence.

I. Facts and Case History

On or about August 18, 1997, Copas was moved into appellant's cell. From the outset, Copas and appellant did not get along. Appellant was upset because prison authorities had moved Copas into his cell without appellant's prior knowledge, because Copas had altered the condition of the cell, and because Copas had used appellant's property without his permission.

Around August 20, 1997, Ricardo Lee, another inmate, asked appellant to allow Copas to remain in appellant's cell until Lee and Copas could become cellmates. According to Lee, appellant "acted as if he was just tolerating him as long as he could until they could move him." The next day, appellant told Lee that "Mr. Copas had bothered his TV set and broken it and that * * * he couldn't really tolerate him anymore, that [he] should do whatever [he] had to do to help him move out of the cell." During a third conversation, on the day before the murder, appellant told Lee that he had "better do something because his wick was getting short."

On August 21, when appellant returned to his cell, he found the cell door open, and some of his belongings were "laying about" or "stolen." Appellant was upset, since "you don't leave your cell door open so that someone can come in and take your cellmate's belongings." Around 9:15 p.m., Copas returned to the cell, appeared intoxicated, crawled into his top bunk, and then vomited.

Appellant decided "that he had had enough." Around 4:00 a.m. or 5:00 a.m. on August 22, 1997, appellant "took a paintbrush, sharpened * * * the tip of it down, took matches and lit the end that he had sharpened as to stiffen it up so that it would be brittle." Appellant created another weapon by taking "a lock off of Mr. Copas' lock box" and then placing it inside a sock. While Copas was asleep, appellant "stood up and plunged the paintbrush handle into Mr. Copas' eye," and the handle broke off. Appellant "didn't mean for it to break; * * * he wanted it to go further in than what it did, but it broke off." Appellant said that he did not stick Copas in the ear "because the ear is too hard. You would use an ice pick in the ear. The eye is much softer."

After being attacked, Copas "rose up out of bed" and asked, "Why the hell did you do that?" Then, appellant struck Copas in the head with the lock and also "took his fist and struck" Copas. Copas passed out

and fell over the television set at the foot of the bed. At that point, appellant "flushed the paintbrush handle remains and the sock down the toilet, placed the padlock back on the locker box, and then sat back in his bed" and smoked a cigarette.

Around 6:00 a.m., Copas arose out of his unconscious condition and "jumped up, ran to the cell door and started screaming that, 'My celly's trying to kill me.' " Doug Stewart, a corrections officer at LCI, heard yelling, went to Copas's cell, and saw Copas "standing at the door, bleeding." Copas was taken to the prison infirmary. In the meantime, appellant was backed out of his cell and handcuffed. When a guard asked him what happened, appellant replied, "I told them not to put him in here with me."

Upon arriving at the prison infirmary, Copas told Linda Young, a registered nurse, that "he was shanked in the head and hit with a battery in a sock." Copas was transferred to the Middletown Regional Hospital about thirty minutes later.

Dr. Ralph Talkers, an emergency physician at Middletown, treated Copas for head lacerations; "his right eye was extremely swollen," consistent with an assault. However, Copas was not treated for stab wounds, since neither his medical records nor Copas himself had indicated that he had been stabbed. Dr. Talkers examined Copas's eye, but there was "no indication whatsoever" that there was a foreign object lodged in or behind his eye. Moreover, results of X-rays of the face and skull proved negative. Thus, Dr. Talkers concluded that Copas's "eye was traumatized * * * because of the blunt injury" during the assault.

According to Dr. Talkers, a CAT (computerized axial tomography) scan of Copas's head was not conducted, since "the patient was awake and talking and did not have * * * focal neurological findings." Moreover, Copas was "observed in the emergency room for approximately five hours" and never lost consciousness. Copas was sent back to the prison infirmary and arrived at around 1:45 p.m. on August 22.

Dr. James McWeeney, the medical director at LCI, found that Copas was "very lucid," and "his speech was clear and deliberate" when he examined Copas on August 23. According to Dr. McWeeney, Copas "did not exhibit any signs of an intracranial injury or severe head trauma." However, Dr. McWeeney ordered an ophthalmology consult and a CAT scan.

On August 26, 1997, Dr. Steven Katz, a neuro-ophthalmologist, examined Copas at the Corrections Medical Center. Copas's eye was

swollen, and there appeared to be "swelling or congestion in the socket behind the eye." A CAT scan completed later that evening showed "a large foreign object * * * like a pen or pencil * * * lodged in the socket just behind the eye, inside the eye muscle cone." According to Dr. Katz, "it appeared to penetrate the pons, which is part of the brain stem, and go back far enough to enter the cerebellum."

On August 27, 1997 neurosurgeons conducted a "pterional craniotomy" and removed the remnant of the paintbrush, which was approximately five inches long, from inside Copas's head. Copas recovered "very quickly from surgery" and was treated with "broad-spectrum intravenous antibiotics" to fight possible infection. However, on September 5, 1997, his medical condition deteriorated. Copas died on September 10, 1997.

*State v. Hanna,* 95 Ohio St.3d 285, 286-88 (2002).

## State Court Proceedings

On January 26, 1998, the Warren County Grand Jury indicted Mr. Hanna for aggravated murder with death specifications (committing a murder in a prison and having a prior homicide conviction) and for possession of a deadly weapon while under detention with specification (repeat violent offender in that he had a prior homicide conviction). Return of Writ, Appendix attached thereto, ("Appendix"), Vol. I at 14-20 (Doc. 12). Trial to a jury commenced on October 26, 1998. *Id.*, Transcripts attached thereto ("Transcript"), Vol. III at 1. On November 6, 1998, the jury returned its verdict finding Mr. Hanna guilty on all counts. Transcript, Vol. IX at 1482-90; Appendix, Vol. II at 215-16; 219.

The jury heard mitigation testimony on November 9, 1998. Transcript Vol. X at 1493. On November 10, 1998, the jury returned its verdict recommending a sentence of death. Transcript, Vol. X at 1715-18; Appendix, Vol. II at 222. On November 20, 1998, the court sentenced Mr. Hanna to death, Transcript, Vol. XI at 3-11, and on November 23, 1998, the court issued its written sentencing opinion as required by Ohio Revised Code § 2929.03(F). Appendix,

Vol. II at 240.

On appeal to the Ohio Supreme Court Hanna raised the following Propositions of

Law:

## PROPOSITION OF LAW NO. 1

WHEN A TRIAL COURT PRECLUDES ADMISSION OF RELEVANT EVIDENCE MATERIAL TO A DEFENDANT'S PURPOSE TO KILL WITH PRIOR CALCULATION AND DESIGN, THE TRIAL COURT VIOLATES A CAPITAL DEFENDANT'S RIGHTS AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 10 AND 16 OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. 2

THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY AS TO WHEN MEDICAL MALPRACTICE MAY CONSTITUTE AN INDEPENDENT INTERVENING CAUSE DENIED APPELLANT HIS RIGHT TO PRESENT A DEFENSE AND A FAIR TRIAL AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 1, 2, 9, 10 AND 16 OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. 3

WHERE THE TRIAL COURT ABUSES ITS DISCRETION IN DENYING A DEFENDANT'S MOTION FOR A JURY VIEW, IT VIOLATES A DEFENDANTS' RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 10 AND 16 OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. 4

WHEN COMPARED TO THE SIMILAR CASES, THE DEATH PENALTY IS AN EXCESSIVE AND DISPROPORTIONATE PENALTY FOR JAMES HANNA.

## PROPOSITION OF LAW NO. 5

THE DEATH SENTENCE MUST BE VACATED WHERE THE MITIGATING FACTORS ARE NOT OUTWEIGHED BY THE AGGRAVATING CIRCUMSTANCES.

**PROPOSITION OF LAW NO. 6**

WHERE THERE IS INSUFFICIENT EVIDENCE OF A PURPOSEFUL KILLING COMMITTED WITH PRIOR CALCULATION AND DESIGN, A TRIAL COURT'S DENIAL OF A RULE 29 MOTION FOR ACQUITTAL VIOLATES A CAPITAL DEFENDANT'S RIGHTS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I § 16 OF THE OHIO CONSTITUTION.

**PROPOSITION OF LAW NO 7**

A JURY INSTRUCTION THAT SKIRTS THE BURDEN OF PROOF ON THE *MENS REA* ELEMENT OF ANY OFFENSE TO THE ACCUSED, OR REDUCES THE STATE'S BURDEN OF PROOF VIOLATES THE DUE PROCESS CLAUSE OF [THE] FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

**PROPOSITION OF LAW NO. 8**

WHEN THE TRIAL COURT DISCOVERS THAT THE PROSECUTION DID NOT COMPLY WITH ITS DUTY TO DISCLOSE EXCULPATORY INFORMATION TO THE DEFENDANT, THE TRIAL COURT MUST REVIEW THE PROSECUTOR'S FILE FOR ADDITIONAL VIOLATIONS AND SEAL THAT FILE FOR APPELLATE REVIEW.

**PROPOSITION OF LAW NO. 9**

WHERE THE PROSECUTOR DENIGRATES THE REASONABLE DOUBT STANDARD, IMPROPERLY USES PEREMPTORY CHALLENGES, FAILS TO COMPLY WITH DISCOVERY, AND MAKES IMPROPER ARGUMENT, A CAPITAL DEFENDANT HAS BEEN DENIED HIS RIGHTS TO DUR PROCESS AND A FAIR TRIAL AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 9 AND 16 OF

THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. 10

PROSECUTORIAL MISCONDUCT DURING THE PENALTY PHASE CLOSING ARGUMENT OF APPELLANT'S TRIAL VIOLATED HIS DUE PROCESS RIGHT TO A FAIR TRIAL AND A RELIABLE DEATH SENTENCE AS GUARANTEED BY THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 9 AND 16 OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. 11

WHEN TRIAL COUNSEL FAIL TO INQUIRE ABOUT PRETRIAL PUBLICITY DURING INDIVIDUAL VOIR DIRE, DENIGRATE THE REASONABLE DOUBT STANDARD, FAIL TO RE-RAISE RELEVANT MOTIONS, FAIL TO MOVE FOR A MISTRIAL OR TO RECALL OR RE-DEPOSE WITNESSES, FAIL TO EFFECTIVELY CROSS EXAMINE WITNESSES, FAIL TO PRESENT A WITNESS WITH KNOWLEDGE OF THE CONDITIONS OF CONFINEMENT, FAIL TO ADEQUATELY PRESENT EVIDENCE OF ABUSE, INTRODUCE VOLUMINOUS RECORDS WITHOUT GUIDANCE TO THE JURY, AND FAIL TO OBJECT, A CAPITAL DEFENDANT IS DEPRIVED OF THE RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 10 AND 16 OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. 12

WHEN THE TRIAL COURT COMPARES A CAPITAL DEFENDANT TO HIS SIBLINGS, IMPROPERLY WEIGHS MITIGATION EVIDENCE AND REFUSES TO CONSIDER MITIGATION EVIDENCE, A CAPITAL DEFENDANT IS DEPRIVED OF THE RIGHT TO INDIVIDUALIZED SENTENCING AND OF HIS LIBERTY INTEREST THUS VIOLATING RIGHTS GUARANTEED BY THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 9 AND 16 OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. 13

> THE DEFENDANT IS ENTITLED TO A NEW TRIAL WHEN THE CUMULATIVE EFFECT OF TRIAL ERROR RENDERS HIS CONVICTION UNRELIABLE.
>
> **PROPOSITION OF LAW NO. 14**
>
> THE ACCUSED'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION IS VIOLATED WHEN THE STATE IS PERMITTED TO CONVICT UPON A STANDARD OF PROOF BELOW PROOF BEYOND A REASONABLE DOUBT.
>
> **PROPOSITION OF LAW NO. 15**
>
> OHIO'S DEATH PENALTY IS UNCONSTITUTIONAL. THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 2, 9, 10 AND 16, OF THE OHIO CONSTITUTION ESTABLISH THE REQUIREMENTS FOR A VALID DEATH PENALTY SCHEME. OHIO REV. CODE ANN. §§ 2903.01, 2929.01, 2929.021, 2929.022, 2929.023, 2929.04 AND 2020.05 9ANDERSON 19960, DO NOT MEET THE PRESCRIBED CONSTITUTIONAL REQUIREMENTS AND ARE UNCONSTITUTIONAL ON THEIR FACE AND AS APPLIED TO JAMES HANNA.

Appendix, Vol. III at 63-214.

On May 22, 2002, the Ohio Supreme Court affirmed Mr. Hanna's conviction and death sentence. *State v. Hanna,* 95 Ohio St.3d 285 (2002); Appendix, Vol. III at 439-69. Mr. Hanna then filed a Motion to Reconsider on June 3, 2002, which the Ohio Supreme Court denied on July 3, 2002. *State v. Hanna,* 96 Ohio St.3d 1441 (2002); Appendix, Vol. III 470-80.

The United States Supreme Court denied Mr. Hanna's certriorari petition on November 18, 2002. *Hanna v. Ohio,* 537 U.S. 1036 (2002); Appendix, Vol. III at 492.

While his direct appeal was pending in the Ohio Supreme Court, Hanna filed his Petition for Post-Conviction Relief pursuant to Ohio Revised Code § 2953.21, in which he raised

the following Grounds for Relief:

### First Ground for Relief

Petitioner Hanna's convictions and sentences are void and/or voidable due to the improper constitution of the jury, in violation if the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 9, 10, and 16 of the Ohio Constitution.
[In this Ground for Relief, Mr. Hanna raised this claim in the context of trial court error.]

### Second Ground for Relief

Petitioner Hanna's convictions and sentences are void and/or voidable due to restrictions placed on the trial and sentencing phases by the trial court, which restrictions in turn forced trial counsel to render ineffective assistance of counsel, in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 9, 10, and 16 of the Ohio Constitution.

### Third Ground for Relief

Petitioner Hanna's conviction and/or sentence are void or voidable because the State withheld exculpatory, impeaching, and mitigation evidence by failing to provide to the defense attorneys, before the trial began, a copy of Trooper James Ertel's complete report, including all the attachments. This action by the Prosecutor violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Article I, Sections 2, 5, 9, 10, 16 and 20 of the Ohio Constitution.

### Fourth Ground for Relief

Petitioner Hanna's convictions and sentences are void and/or voidable due to the improper constitution of the jury, in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 9, 10, and 16 of the Ohio Constitution.  The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to a trial by a fair and impartial jury.
[In this Ground for Relief, Mr. Hanna raised this claim in the context of an ineffective assistance of counsel claim.]

## Fifth Ground for Relief

Petitioner Hanna's conviction and/or sentence are void or voidable because his trial counsel failed, during voir dire to question juror Howard E. Reeves concerning whether his felony conviction would impair his ability to be a fair and impartial juror. This action by the defense attorneys violated Petitioner' rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Article I, Sections 2, 5, 9, 10, 16 and 20 of the Ohio Constitution.

## Sixth Ground for Relief

Petitioner Hanna's conviction and/or sentence are void or voidable because he was denied the effective assistance of counsel in the trial phase of his capital trial, as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.
[In this Ground for Relief, Mr. Hanna alleged that his trial counsel were ineffective for failing to re-raise their motion that the prosecutor's file be copied and sealed for appellate review.]

## Seventh Ground for Relief

Petitioner Hanna's conviction and/or sentence are void or voidable because his trial counsel failed to present adequate expert assistance in his defense during the capital trial and mitigation hearing. This action by the defense attorneys violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Article I, Sections 2, 5, 9, 10, 16 and 20 of the Ohio Constitution.
[In this Ground for Relief, Mr. Hanna alleged that his trial counsel were ineffective for failing to present expert testimony relating to the discrete culture which exists inside a prison.]

## Eighth Ground for Relief

Petitioner Hanna's conviction and/or sentence are void or voidable because his trial counsel failed to adequately investigate and present sufficient evidence in his defense during the mitigation phase of the trial. This action by the Defense Attorneys violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Article I, Sections 2, 5, 9, 10, 16 and 20 of the Ohio Constitution.

[In this Ground for Relief, Mr. Hanna alleged that his trial counsel were ineffective by failing to cross-examine Joseph Scurlock, a Department of Rehabilitation and Correction employee who testified during the state's case-in-chief.]

## Ninth Ground for Relief

Petitioner Hanna's conviction and/or sentence are void or voidable because his trial counsel failed to investigate and present during the mitigation phase of the trial sufficient evidence explaining the Ohio Department of Rehabilitation and Correction policy regarding the criteria for inmate incarceration in high maximum security prisons. This action by the Defense Attorneys violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Article I, Sections 2, 5, 9, 10, 16 and 20 of the Ohio Constitution.

## Tenth Ground for Relief

Petitioner Hanna's convictions and/or sentences are void or voidable because he was denied the effective assistance of counsel in the mitigation phase of his capital trial as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.
[In this Ground for Relief, Mr. Hanna argues that his trial counsel were ineffective by failing to prepare Dr. Kathleen Burch to testify about how his psychological and emotional makeup was molded during the 30 years he spent in prison.]

## Eleventh Ground for Relief

Petitioner Hanna's convictions and/or sentences are void or voidable because he was denied the effective assistance of counsel in the mitigation phase of his capital trial as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.
[In this Ground for Relief, Mr. Hanna argues that his trial counsel were ineffective in their mitigation investigation because they did not interview or failed to adequately interview family members who were available and would have testified for him at the time of his capital trial.]

**Twelfth Ground for Relief**

Petitioner Hanna's conviction and sentence are void or voidable because the post-conviction process provides an inadequate corrective process.

**Thirteenth Ground for Relief**

The judgment and sentence against Petitioner are void or voidable because the death penalty as administered by electrocution in the state of Ohio violates his constitutional rights to protection from cruel and unusual punishment and to due process of law. U.S. Const. amends. VIII, IX, XIV; Ohio Const. art. 1 §§ 9, 10, 16; *Ohio Adult Parole Authority v. Woodard,* 523 U.S. 272 (1998).

**Fourteenth Ground for Relief**

The judgment and sentence against Petitioner are void or voidable because the death penalty as administered by lethal injection in the state of Ohio violates his constitutional rights to protection from cruel and unusual punishment and to due process of law. U.S. Const. amends. VIII, IX, XIV; Ohio Const. art. 1 §§ 9, 10, 16; *Ohio Adult Parole Authority v. Woodard,* 523 U.S. 272 (1998).

**Fifteenth Ground for Relief**

Petitioner Hanna's judgment and sentence are void or voidable because, assuming *arguendo* that none of the Grounds for Relief in his Post-Conviction Petition individually warrant the relief sought from this court, the cumulative effects of the errors and omissions as presented in the Petition's foregoing paragraphs have been prejudicial and have denied Petitioner his rights as secured by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article 1 Sections 2, 9, 10, and 16 of the Ohio Constitution.

Appendix, Vol. IV at 14-60.

The trial court rejected all of Mr. Hanna's Grounds for Relief and denied his Petition.

*State v. Hanna,* No. 98CR17677, 2001 WL 36043647 (Ct. Common Pleas Warren Cnty., Mar. 22, 2001); Appendix, Vol. V at 333-50. On appeal Hanna the following Assignments of Error:

**ASSIGNMENT OF ERROR NO. 1**

THE TRIAL COURT ERRED BY DISMISSING APPELLANT'S POST-CONVICTION PETITION, WHERE HE PRESENTED SUFFICIENT OPERATIVE FACTS AND SUPPORTING EXHIBITS TO MERIT AN EVIDENTIARY HEARING AND DISCOVERY.

1. In an action for post-conviction relief, a petition that presents sufficient operative facts supported by evidence dehors the record meets the required pleading standard and must not be summarily dismissed without an evidentiary hearing.

2. The doctrine of *res judicata* does not apply to claims in a post-conviction petition that could not be fully litigated on direct appeal and that were supported by evidence dehors the record.

**ASSIGNMENT OF ERROR NO. 2**

THE TRIAL COURT ERRED BY FAILING TO PROVIDE AN EFFECTIVE REMEDY.

1. When a petitioner has the burden of supporting grounds for relief with evidence outside the record, but is denied discovery, and the petition is summarily dismissed without a hearing, post-conviction in Ohio fails to provide an effective remedy.

**ASSIGNMENT OF ERROR NO. 3**

THE TRIAL COURT ERRED BY FAILING TO RECOGNIZE THAT THE CUMULATIVE ERRORS SET FORTH IN APPELLANT'S SUBSTANTIVE GROUNDS FOR RELIEF MERIT REVERSAL OR REMAND FOR A PROPER POST-CONVICTION PROCESS.

Appendix, Vol. VI at 37-76.

On December 21, 2001, the court of appeals affirmed the trial court. *State v. Hanna,* No. CA2001-04-032, 2002 WL 4529 (Ohio App. 12th Dist. Dec. 21, 2001); Appendix, Vol. VI at 224; 225-43). The Ohio Supreme Court did not allow the appeal. *State v. Hanna,* 96 Ohio St.3d 1438 (2002); Appendix, Vol. VII at 133.

## Proceedings in this Court

On September 25, 2002, Mr. Hanna filed a Notice of Intention to File Habeas Corpus Petition. (Doc. 1). This Court granted Mr. Hanna's Motion for Appointment of Counsel, (Doc. 4), and on November 17, 2003, Mr. Hanna filed his Petition for Writ of Habeas Corpus. (Doc. 10). Subsequently, the parties engaged in discovery. See Doc. 32, 47, 55, 73, 94. The Court then held an evidentiary hearing on March 20 and 21, 2007, at which the Court heard testimony from James Scurlock, Steve Martin, Kenneth Ewing, James Ertel, James Quinn, and William Fowler. (Doc. 102, 104, 105). The parties have filed post-hearing briefs, (Doc. 118, 119), and the matter is ripe for Report and Recommendations on the merits.

Mr. Hanna has pled the following Grounds for Relief in his Petition:

### First Ground for Relief

**When a convicted felon served on Petitioner Hanna's capital jury, he was denied his Due Process rights to a fair and impartial jury, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution**.

### Second Ground for Relief

**The Trial Court prohibited Trial Counsel from reviewing all available prison records pertaining to the victim and thereby violated Petitioner Hanna's rights to effective assistance of counsel guaranteed by the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.**

### Third Ground for Relief

**Petitioner Hanna's Due Process rights guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution were denied when the State suppressed exculpatory and impeachment evidence that was favorable to petitioner.**

### Fourth Grounds for Relief

14

Petitioner Hanna was denied the right to effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution when his Trial Counsel failed to investigate and present adequate mitigation evidence during the penalty phase.

A.  Trial counsel failed to utilize the services of an expert witness to explain the culture of prison life.

B.  Trial counsel was ineffective when they failed to investigate and utilize the knowledge and experience of prison employee James Scurlock regarding his positive experiences with Petitioner in prison.

C.  Trial counsel were ineffective when they failed to present evidence of the criteria for placing a prisoner in a maximum security prison where he would be prevented from harming another inmate.

D.  Trial counsel were ineffective when they failed to provide to mitigation psychologist Dr. Kathleen Burch all relevant, available documentation about Petitioner.

E.  Trial counsel were ineffective when they failed to investigate and present significant mitigation evidence.

### Fifth Ground for Relief

Petitioner Hanna was denied his rights to a fair trial in the trial phase of his capital trial because his counsel's performance fell below constitutional standards and Hanna suffered prejudice.

A.  Trial Counsel failed to ascertain during *voir dire* whether Juror Reeves was competent under Ohio law to serve on a jury.

B.  Trial Counsel were ineffective when they failed to question Juror Reeves about his prison experiences to determine whether he could be a fair juror at Petitioner Hanna's trial which involved [ ] a killing in prison.

C.  Trial Counsel were ineffective because they failed to re-raise their motion that the prosecutor's file be copied and sealed for appellate review.

**D. Trial counsel were ineffective for failing to point out the inconsistencies in the testimony of the prosecution's medical experts.**

### Sixth Ground for Relief

The jury instruction on causation and foreseeability given in this case shifted the burden of proof on the mens rea element of the offense to the accused and reduced the State's burden of proof in violation [of] the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

### Seventh Ground for Relief

The trial court's failure to instruct the jury as to when medical malpractice may constitute an independent intervening cause denied Petitioner Hanna his right to present a defense and a fair trial in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

### Eighth Ground for Relief

The preclusion of Petitioner Hanna's proffered evidence as to the prevalence of "shanks" in the prison system was a violation of Hanna's Due Process rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### Ninth Ground for Relief

Execution by lethal injection represents cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

### Tenth Ground for Relief

Petitioner Hanna's convictions and death sentence are invalid because the cumulative effect of the constitutional errors set forth in this Habeas Corpus Petition violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

(Doc. 10).

### Standard of Review

**I. <u>Antiterrorism and Effective Death Penalty Act of 1996</u>**

The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L.No. 104-132, 110 Stat. 1214 (Apr. 24, 1996) ("AEDPA") applies to all habeas cases filed after April 25, 1996. *Herbert v. Billy,* 160 F.3d 1131 (6th Cir. 1998), *citing, Lindh v. Murphy,* 521 U.S. 320 (1997). Since Mr. Hanna filed his Petition well after the AEDPA's effective date, the amendments to 28 U.S.C. § 2254 embodied in the AEDPA are applicable to his Petition.

Title 28 U.S.C. § 2254, as amended by the AEDPA, provides:

...
(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254.

The AEDPA also provides that a factual finding by a state court is presumed to be correct, and a petitioner must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e). In addition, pursuant to the AEDPA, before a writ may issue on a claim that was evaluated by the state courts, the federal court must conclude that the state court's adjudication of a question of law or mixed question of law and fact was "contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).

A state court's decision is contrary to the Supreme Court's clearly-established precedent if: (1) the state court applies a rule that contradicts the governing law as set forth in Supreme Court case law; or (2) the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000). A state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal rule [from Supreme Court cases] but unreasonably applies it to the facts of the particular state prisoner's case", "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply[,] or [if the state court] unreasonably refuses to extend that principle to a new context where it should apply." *Williams,* 529 U.S. at 407-08. For a federal court to find a state court's application of Supreme Court precedent unreasonable, the state court's decision must have been more than incorrect or erroneous; it must have been "objectively unreasonable." *Wiggins v. Smith,* 539 U.S. 510, 520-21 (2003); *Williams,* 529 U.S. at 407, 409. An *unreasonable* application of federal law is different from an *incorrect* application of federal law. *Id.* at 410 (emphasis in original). In sum, Section 2254(d)(1) places a new constraint on the power of a federal court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. *Id.* at 412 (Justice O'Connor, concurring).

A state court decision is not "contrary to" Supreme Court law simply because it does not specifically cite Supreme Court cases. *Early v. Packer,* 537 U.S. 3 (2002). Indeed, "contrary to" does not even require awareness of Supreme Court cases, so long as neither the reasoning nor the result of the state-court decision contradicts them. *Id.* at 8. The AEDPA prohibits the

overturning of state decisions simply because the federal court believes that the state courts incorrectly denied the petitioner relief:

> By mistakenly making the "contrary to" determination and then proceeding to a simple "error" inquiry, the Ninth Circuit evaded Section 2244(d)'s requirement that decisions which are not "contrary to" clearly established Supreme Court law can be subjected to habeas relief only if they are not merely erroneous, but "an unreasonable application" of clearly established federal law, or based on "an unreasonable determination of the facts".

*Id.* at 11.

For the purposes of the AEDPA, the court reviews the last state court decision on the merits. *Howard v. Bouchard,* 405 F.3d 459, 469 (6th Cir. 2005), *cert. denied,* 546 U.S. 1100 (2006).

The AEDPA standard of review applies only to "any claim that was adjudicated on the merits in State court proceedings." *Danner v. Motley,* 448 F.3d 372, 376 (6th Cir. 2006). A state court's failure to articulate reasons to support its decision is not grounds for reversal under the AEDPA. *Williams v. Anderson,* 460 F.3d 789, 796 (6th Cir. 2006), *citing, Harris v. Stovall,* 212 F.3d 940 (6th Cir. 2000), *cert. denied,* 432 U.S. 947 (2001). Where the state court fails to adjudicate a claim on the merits, the habeas court conducts an independent review of a petitioner's claims. *Williams*, *supra.* That independent review, however, is not a full, *de novo* review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Williams, supra.*

## II.  **Procedural Default**

The standard for evaluating a procedural default defense is as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice

as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 749 (1991); *see also, Simpson v. Jones,* 238 F. 3d 399, 406 (6th Cir. 2000). That is, a petitioner may not raise on federal habeas a federal constitutional right he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Engle v. Isaac*, 456 U.S. 107 (1982). Absent cause and prejudice, a federal habeas petitioner who fails to comply with a state's rules of procedure waives his right to federal habeas corpus review. *Boyle v. Million*, 201 F. 3d 711, 716 (6th Cir. 2000); *Murray v. Carrier*, 477 U.S. 478 (1986); *Engle v. Isaac*, 456 U.S. 107 (1982); *Wainright,* 433 U.S. at 87.

The Sixth Circuit Court of Appeals requires a four-part analysis when determining whether a habeas claim is barred by procedural default. *Reynolds v. Berry*, 146 F. 3d 345, 347-48 (6th Cir. 1998), *citing Maupin v. Smith*, 785 F. 2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F. 3d 594 (6th Cir. 2001), *cert. denied,* 534 U.S. 1147 (2002).

First the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
 . . .
Second, the court must decide whether the state courts actually enforced the state procedural sanction, citing *County Court of Ulster County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).

Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.

Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin,*785 F. 2d at 138.

Additionally, it is well settled that "federal courts do not have jurisdiction to consider a claim in a *habeas* petition that was not 'fairly presented' to the state courts." *Jacobs v. Mohr*, 265 F.3d 407, 415 (6th Cir. 2001), *citing, McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir. 2000). A claim may only be considered "fairly presented" if the petitioner asserted both the factual and legal basis for his claim to the state courts. *Jacobs, supra* (citation omitted).

## Merits of the Petition

### First Ground for Relief

**When a convicted felon served on Petitioner Hanna's capital jury, he was denied his Due Process rights to a fair and impartial jury, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution**.

Mr. Hanna alleges in his First Ground for Relief that his federal due process rights were violated because juror Howard Reeves was a convicted felon and therefore ineligible to serve on the jury. Mr. Hanna's position is that because a convicted felon served on his jury, he was denied his right to trial by an impartial jury.

Mr. Hanna brought this claim in his state post-convictions proceedings and the appeals court rejected it as follows:

> Appellant argues he was denied a fair and impartial jury because a convicted felon, Juror Reeves, was allowed to sit on the jury in violation of R.C. 2961.01 and 2951.09. In a number of cases in this state, courts have pronounced the general rule to be that if one not having the qualifications of a juror is retained upon the panel, without the knowledge of the party or his counsel and after reasonable diligence was used to ascertain the fact when the jury is impaneled, a new trial should be granted. See *Cottman v. Federman Co.* (1942), 71 Ohio App. 89, 99, 47 N.E.2d 1009.
>
> It is equally clear that the proper time to make an objection with

respect to a juror's qualifications is at the impaneling of the jury. If an objection is not taken, the matter is waived unless the party is able to show to the court, upon hearing, that with the exercise of diligence he could not have made the objection at the proper time. *State v. Stukey* (1973), 40 Ohio App. 2d 512, 520, 320 N.E.2d 690. See, also, *Watts v. Ruth* (1876), 30 Ohio St. 32, 36, (juror is a minor); *Kenrick v. Reppard* (1872), 23 Ohio St. 333 (juror not an elector); *Eastman v. Wight* (1854), 4 Ohio St. 156, 161 (juror not an elector); *Hayward v. Calhoun* (1853), 2 Ohio St. 164, 166 (juror belonged to former jury in same case); *Conrad v. Kerby* (1940), 66 Ohio App. 359, 31 N.E.2d 168 (juror statutorily ineligible).

Among the various reasons given for the rule requiring objection at the impaneling of the jury are to prevent constant mistrials and to protect the rights of the adverse party. See *Cottman,* 71 Ohio App. at 99. The principal reason for the rule is that "it would be trifling with the forms of justice to permit a party to waive these rights that he should exercise before the jury are sworn, and run the chances of a verdict, and after it had gone against him, to use it for the purpose of obtaining a new trial." *Hayward,* 2 Ohio St. at 166. In other words, "[a] defendant cannot be satisfied with a juror [at the time the jury is impaneled] *** and then be heard to say after conviction that he is not then satisfied. One may not play fast and loose in this fashion." *Fry v. State* (1932), 43 Ohio App. 154, 156, 182 N.E. 695.

In *Queenan v. Oklahoma* (1902), 190 U.S. 548, 23 S. Ct. 762, 47 L. Ed. 1175, during trial one of the jurors was discovered to be a convicted felon, contrary to the statement of the juror during voir dire. 23 S. Ct. at 763. The trial court asked defense counsel what they desired to do, and defense counsel answered they had nothing to say. *Id*. The trial proceeded and the defendant was found guilty. *Id*. Defendant then argued that he was deprived of a constitutional right, which he could not waive. *Id.* The United States Supreme Court held that "it was [the defendant's] duty to object at the time, if he was going to object at all. He could not speculate on the chances of getting a verdict and then set up that he had not waived his rights." 190 U.S. at 552, 23 S. Ct. at 764.

Similarly, with the exercise of due diligence, appellant had the opportunity to take exception to Juror Reeves at the proper time. In the prospective juror questionnaire, Juror Reeves answered five separate questions by indicating that he, a member of his family, or someone close to him had been arrested, convicted, and served six months in jail and five years on probation. It does not appear that Juror Reeves attempted to conceal the nature of his criminal record. Appellant's counsel had the obligation to ask questions that would

have revealed whether Juror Reeves was a suitable juror. See *State v. Woodards* (1966), 6 Ohio St. 2d 14, 22, 215 N.E.2d 568. Appellant's counsel could have easily inquired about the nature of Juror Reeves' criminal past at the impaneling of the jury given the answers Juror Reeves furnished on the juror questionnaire.

There is nothing in the record to indicate appellant's counsel was prohibited from inquiring into the particulars of Juror Reeves' status as a felon during voir dire. There is nothing in the record to indicate that appellant's counsel ever requested a challenge for cause or a peremptory challenge as to Juror Reeves. Further, appellant has alleged no operative facts to indicate that the jury who heard his case was other than fair and impartial. Thus, appellant must be held to have waived his right to object to Juror Reeves as he failed to object to the juror at the time the jury was impaneled. See *Fry,* 43 Ohio App. at 156. See, also, State v. Myers (C.P.1888), 10 Ohio Dec.Rep. 397, 399.

Furthermore, the subsequent discovery of a disability on the part of a juror or jurors after the case is concluded does not constitute grounds upon which to predicate error. *Conrad,* 66 Ohio App. at 361-362. Therefore, appellant's claim that he was denied the right to be tried by a fair and impartial jury because Juror Reeves was statutorily ineligible is without merit.

*Hanna,* 2002 WL 4529 at *3-5.

Respondent's position is that the state appeals court determined that Mr. Hanna failed to make a contemporaneous objection as to Mr. Reeves sitting on his jury and therefore this claim is procedurally defaulted.

As noted above, absent cause and prejudice, a federal habeas petitioner who fails to comply with a state's rules of procedure waives his right to federal habeas corpus review. See, *e.g., Boyle,* 201 F.3d at 716.

States have a very strong interest in the contemporaneous objection rule. *Scott v. Mitchell,* 209 F.3d 854 (6th Cir. 2000), quoting extensively from *Wainwright v. Sykes*, 433 U.S. 72, 88-90 (1977). For purposes of a procedural default analysis, Ohio's contemporaneous objection rule

is an adequate and independent state ground which the state courts apply consistently. *Scott,* 209 F.3d at 867, citing *Engle v. Isaac,* 456 U.S. 107, 124-29 (1982). In rejecting his claim with respect to Juror Reeves, the state post-conviction court applied Ohio's contemporaneous objection rule. Therefore, Mr. Hanna's Second Ground for Relief is procedurally defaulted. However, assuming *arguendo* that this claim is not procedurally defaulted, it is without merit.

In Ohio, a individual who has been convicted of a felony cannot serve as a juror absent a full pardon. See *Jones v. Bradshaw,* 489 F.Supp.2d 786, 810 (N.D. Ohio 2007), citing, O.R.C. § 2961.01. It appears, then, that Mr. Hanna has raised a question of state law in his First Ground for Relief.

Federal habeas corpus is available only to correct federal constitutional violations. 28 U.S.C. § 2254(a); *Lewis v. Jeffers.* 497 U.S. 764, 780 (1990); *Smith v. Phillips*, 455 U.S. 209, 221 (1982); *Barclay v. Florida,* 463 U.S. 939, 957 (1983). "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991). The question, then, is whether the presence of a convicted felon on Mr. Hanna's jury, even if in violation of Ohio law, violated Mr. Hanna's federal constitutional rights.

The Sixth and Fourteenth Amendments to the Constitution guarantee a criminal defendant the right to an impartial jury. See *Morgan v. Illinois,* 504 U.S. 719 (1992). However, the Sixth Amendment does not bar convictedfelons from jury service. *United States v. Boney*, 977 F.2d 624, 633 (D.C. Cir. 1992); *Coleman v. Calderon,* 150 F.3d 1105, 1117 (9th Cir. 1998), *rev'd on other grounds,* 525 U.S. 141 (1998). A juror disqualification "defect is not fundamental as affecting the

substantial rights of the accused, and the verdict is not void for want of power to render it." *Kohl v. Lehlback,* 160 U.S. 293, 302 (1895).  In other words, the right to a jury of non-felons is not so fundamental that it affects the substantial rights of the accused.  See *Id.*  The right, of course, is to an *impartial* jury.  See *Morgan, supra.*

On *voir dire*, in response to questions presented by Mr. Hanna's counsel, Mr. Reeves testified that he: (1) would not "hold [it] against the defense" if, two days into the trial, he were to learn of something about Mr. Hanna that was not brought out earlier in the proceedings; (2) would not take into consideration the fact that Mr. Hanna had a prior felony conviction; (3) would require the prosecutor to carry his burden of proof; (4) would follow the instructions the court gave the jury; and (5) would consider psychological evidence if it were admitted during the mitigation phase. Transcript Vol. V at 639-41; 646-47.

Mr. Hanna has not pointed to, nor has this Court found anything in the record to indicate that Mr. Reeves was anything but an impartial juror.   This Court concludes that Mr. Hanna's right to an impartial jury was not violated when Mr. Reeves, a convicted felon, served on the jury which convicted him.

Mr. Hanna's First Ground for Relief is procedurally defaulted and, in the alternative, the state courts' decision of this ground for relief is not contrary to, or an objectively unreasonable application of, clearly established federal law.  It should be dismissed with prejudice.

## Second Ground for Relief

**The Trial Court prohibited Trial Counsel from reviewing all available prison records pertaining to the victim and thereby violated Petitioner Hanna's rights to effective assistance of counsel guaranteed by the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.**

In his Second Ground for Relief, Mr. Hanna argues that the trial court caused his trial counsel to be ineffective because it did not allow his counsel to review Peter Copas' entire prison file.

The Twelfth District Court of Appeals addressed this claim during the post-conviction proceedings, writing

> Appellant next argues that his PCR petition set forth sufficient operative facts to establish substantive grounds for relief based upon other instances of ineffective assistance of counsel. In Ohio, a properly licensed attorney is presumed to be competent. See *Vaughn v. Maxwell* (1965), 2 Ohio St. 2d 299, 209 N.E.2d 164. Accordingly, the defendant bears the burden of proof to demonstrate that he was denied the effective assistance of counsel. *Id.* Only if the defendant demonstrates that there is a reasonable possibility that, but for counsel's unprofessional errors, the result of the proceedings against the defendant would have been more favorable, will a reviewing court find prejudice. *State v. Bradley* (1989), 42 Ohio St. 3d 136, 538 N.E.2d 373, paragraph three of the syllabus. This probability must be sufficient to undermine confidence in the case's outcome. Id. The effectiveness of counsel must be reviewed in light of the evidence against the defendant, with a "strong presumption that counsel's conduct falls within the wide range of professional assistance." *Strickland,* 466 U.S. at 689, 104 S. Ct. at 2065. The appellate court must not second-guess trial counsel's strategic decisions. *State v. Carter (*1995), 72 Ohio St. 3d 545, 558, 651 N.E.2d 965.
>
> Appellant maintains that he received ineffective assistance of counsel because the trial court refused to allow trial attorneys to see and analyze portions of Copas' prison record; that he was denied exculpatory, impeaching and mitigating evidence; and that he received ineffective assistance of counsel based upon numerous cumulative prejudicial errors.
>
> When reviewing the impact of decisions made by a trial court on the effectiveness of counsel, "a court should presume *** that the judge acted according to law." *Strickland,* 466 U.S. at 694, 104 S. Ct. at 2068. Appellant alleges that he was prevented from receiving effective assistance of counsel because the trial court refused to allow trial attorneys to see and analyze Copas' entire Department of Rehabilitation and Corrections ("DRC") file. The court conducted an in camera inspection of Copas' DRC file and, without objection,

certain pages were retained by the court. The retained records of Copas' DRC file contained conduct, incident, and hearing reports. The pages that had a bearing on the guilt phase or mitigation in the penalty phase were released to appellant.

The referenced materials in Copas' file display no connection between Copas and appellant. There is no evidence that appellant had knowledge of incidents in Copas' file, or any contention as to how the contents of the file would provide evidence of provocation in the guilt phase or mitigation in the penalty phase. Therefore, we find the argument to be without merit.

*Hanna,* 2002 WL 4529 at **6-*7.

Respondent argues that this claim is partially procedurally defaulted. Specifically, Respondent's position is that Mr. Hanna never presented to the state courts the due process portion of this claim. Mr. Hanna does not challenge the Respondent's position on that issue. Rather, he argues that the words "due process" were inadvertently inserted in his habeas Petition and that he has always only intended the Second Ground for Relief to be a claim for a Sixth Amendment violation of his right to effective assistance of counsel. (Doc. 23 at 33-34). Indeed, it appears that Mr. Hanna has abandoned any due process claim. Accordingly, because Mr. Hanna admittedly failed to "fairly present" this claim to the state courts as a due process violation, this Court is precluded from addressing any due process claim on its merits. *Jacobs,* 265 F.3d at 415.

The Court turns to Mr. Hanna's claim that the trial court caused his alleged denial of effective assistance of counsel.

A claim of ineffective assistance of counsel is, of course, governed by *Strickland v. Washington,* 466 U.S. 668, 687 (1984). In this claim, Mr. Hanna argues that the trial court *caused* his counsel to be ineffective under *Strickland* when it denied counsel access to Mr. Copas' entire prison file.

Mr. Hanna has not cited, nor has this Court found, any federal law which stands for

27

the proposition that there exists a cognizable claim for "court induced ineffective assistance of counsel". Contrary to Mr. Hanna's argument, neither *United States v. Cronic,* 466 U.S. 648 (1984) nor *Bell v. Cone*, 535 U.S. 685 (2002) provide support for his claim.

In addressing the petitioner's ineffective assistance of counsel claim, the *Cronic* court considered whether the Court of Appeals was correct in reversing a defendant's conviction under the Sixth Amendment without inquiring into counsel's actual performance or requiring the defendant to show the effect it had on the trial. *Bell,* 535 U.S. at 695, citing, *Cronic,* 466 U.S. at 658. The Court determined that the court of appeals had erred and remanded to allow the claim to be considered under *Strickland's* test. *Bell, supra*, citing, *Cronic, supra* at 666-67. In the course of deciding that question, the Court identified three situations implicating the right to counsel that involved circumstances "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Bell, supra,* citing, *Cronic, supra* at 658-59. There is nothing in *Cronic* or *Bell* which establishes a claim such as Mr. Hanna's "court induced ineffective assistance of counsel" claim. Moreover, Hanna has not proven by clear and convincing evidence that the state court findings relative to this claim are not correct. The Second Ground for Relief should be dismissed

### Third Ground for Relief

**Petitioner Hanna's Due Process rights guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution were denied when the State suppressed exculpatory and impeachment evidence that was favorable to petitioner.**

In his Third Ground for Relief, Mr. Hanna alleges that his constitutional rights were violated when the prosecutor failed to produce Trooper James Ertel's complete report. Mr. Hanna's

position is that by failing to turn over Trooper Ertel's entire report, the state committed a violation

of *Brady v. Maryland*, 373 U.S. 83 (1963).

Mr. Hanna raised this claim during the post-conviction proceedings and the Court

of Appeals rejected it stating:

> Appellant next argues that exculpatory, impeaching and mitigating evidence was withheld from him. Appellant alleges the incident report of Trooper Ertel, detailing the stabbing, was not furnished to counsel until mid-trial. The record reflects that appellant's trial counsel had the opportunity to review the report over the course of a weekend. Appellant's counsel then moved for, and received, an order for the production of summaries of statements referred to in the report. The court recessed to allow defense counsel time to review the statements. There is no indication that more time was needed or requested.

> Appellant argues that there are eleven pages from the Ertel report outside the record, and that these pages are material under *Brady v. Maryland* (1963), 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215. Under Brady, suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment. *Brady,* 373 U.S. at 87, 83 S. Ct. at 1196-1197. Evidence is "material" where its disclosure presents "a reasonable probability that *** the result of the proceeding would have been different." *State v. Aldridge* (1997), 120 Ohio App. 3d 122, 137, 697 N.E.2d 228.

> The referenced items would not, to a reasonable probability, have resulted in different findings by the jury. Appellant was able to present his entire account of the events leading up to the stabbing, including his perceived provocation, in his statements made to and related by Trooper Ertel to the jury. The statements of other inmates would be merely cumulative. Therefore, no material evidence was withheld, and consequently, no Brady violation occurred. Thus, this argument has no merit.

*Hanna,* 2002 WL 4529 at *7.

Mr. Hanna's Third Ground for Relief, in reality, contains two separate claims. The

first involves evidence which the State produced during his trial pursuant to the trial court's order

("first sub-claim").  The second claims involves evidence which was not produced until the post-conviction proceedings ("second sub claim").

Under *Brady*, the prosecution must disclose all material, exculpatory evidence to a defendant, irrespective of whether the failure to disclose was  done in good or bad faith. *Jells v. Mitchell,* 538 F.3d 478, 501 (6th Cir. 2008).  To assert a successful *Brady* claim, a habeas petitioner must show that (1) the withheld evidence was favorable to the petitioner, (2) the evidence was suppressed by the government, and (3) the petitioner suffered prejudice. *Id.,* citing *Strickler v. Greene,* 527 U.S. 263 (1999).  The *Brady* rule encompasses both exculpatory and impeachment evidence when such evidence is material. *Jells, supra,* citing *United States v. Bagley,* 473 U.S. 667 (1985); see also, *Bell v. Bell*, 512 F.3d 223 (6th Cir. 2008).  The Sixth Circuit explained in *United States v. Bencs*, 28 F.3d. 555, 560 (6th Cir. 1994), *cert. denied,* 513 U.S. 1117 (1995), that materiality pertains to the issue of guilt of innocence, and not to the defendant's ability to prepare for trial. *Jells, supra*.

Evidence is material under *Brady* if a reasonable probability exists that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  *Jells,* 538 F.3d 501-02, citing *Bagley,* 473 U.S. at 683.  A reasonable probability is one that sufficiently undermines confidence in the outcome of the trial.  *Jells, supra,* citing, *Bagley, supra.* "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Jells*, *supra,* quoting *Kyles v. Whitley,* 514 U.S. 419, 434 (1995). When determining whether the withheld information was material and therefore prejudicial, we consider it in the light of the evidence available for trial that supports the petitioner's conviction.

*Jells, supra,* citing *Towns v. Smith,* 395 F.3d 251, 260 (6th Cir. 2005) and *Clinkscale v. Carter,* 375 F.3d 430, 445 (6th Cir. 2004), *cert. denied,* 543 U.S. 1177 (2005).

In general, the principles announced in *Brady* do not apply to a tardy disclosure of exculpatory information, but to a complete failure to disclose. *Norris v. Schotten*, 146 F.3d 314, 333 (6th Cir.), *cert. denied,* 525 U.S. 935 (1998). If previously undisclosed evidence is disclosed during trial, no *Brady* violation occurs unless the defendant has been prejudiced by the delay in disclosure. *Id.* citing *United States v. Word,* 806 F.2d 658, 665 (6th Cir. 1986), *cert. denied,* 480 U.S. 922 (1987). This is logical since under the *Brady* doctrine evidence is material only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Norris, supra,* citing *United States v. Phillip,* 948 F.2d 241, 249 (6th Cir. 1991), *cert. denied,* 504 U.S. 930 (1992). After all, and as noted above, the overriding concern is with the justice of the finding of guilt, not with the accused's ability to prepare for trial. *Norris, supra,* citing *United States v. Agurs,* 427 U.S. 97 (1976).

An express agreement between the prosecution and a witness is possible impeachment material that must be turned over under *Brady*. *Bell*, 512 F.3d at 233, citing, *Giglio v. United States,* 405 U.S. 150, 154-55 (1972). The existence of a less formal, unwritten or tacit agreement is also subject to *Brady's* disclosure mandate. *Bell, supra.* (citation omitted).

Prior to the commencement of his trial, Mr. Hanna's counsel filed at least three (3) motions for discovery and an amended demand for discovery. Appendix, Vol. VI at 131-49. Nevertheless, defense counsel never received a copy of the report of the investigation of the incident involving Petitioner and Mr. Copas which the chief investigating officer, Trooper Ertel, prepared. Mr. Hanna's counsel did not see that report until the prosecutor used it to refresh Trooper Ertel's

recollection during his trial testimony. Transcript, Vol. VII at 1090-91. At that time, defense counsel requested a copy of Trooper Ertel's report and the court ordered the prosecutor to give Mr. Hanna's counsel a copy of the report. *Id.* The prosecutor complied and the proceedings were then recessed for the weekend. *Id.*

When the proceedings convened on Monday morning, Mr. Hanna's counsel informed the court that Trooper Ertel's report referred to a number of attached items but that those items were not, in fact, attached to the report. *Id.* at 1095-1101. The court then ordered the prosecutor to produce the referenced attachments. *Id.* Mr. Hanna's counsel requested time to review the attachments and the court recessed at 9:22 a.m. The Court then reconvened at 9:45 a.m. and Mr. Hanna's counsel proceeded with his cross-examination of Trooper Ertel. *Id.* at 1101-02.

When Mr. Hanna filed his state post-conviction petition, he attached to that petition a copy of the file which the Ohio State Highway Patrol maintained with respect to its investigation of the killing of Mr. Copas. Appendix, Vol. IV at 14-348. In addition, Mr. Hanna attached affidavits from his trial counsel which identified documents within that report which the state had never produced to them. *Id.* at 226-43; 244-61. Those documents include the following:

(1) a March 17, 1992, Conduct Report about an incident in which Mr. Copas was involved with another inmate (Morrissey) which created an disturbance; *Id.* at 231 and 249;

(2) a May 22, 1997, Memorandum from Deputy Warden Dan Burns to Warden Harry Russell indicating that Mr. Copas' placement on Security Control, which began on May 8, 1997, was extended on May 15, 1997, and again on May 22, 1997; *Id.* at 232 and 250;

(3) an October 13, 1995, report indicating that Mr. Copas had received ten "tickets" since April, 1995, and was not appropriate for medium security and requesting an override

to close security; *Id.* at 233 and 251;

(4) an October 11, 1995, inter-office communication listing twelve infractions with which Mr. Copas was charged between September 23, 1992, and September 29, 1995, including making threatening statements to staff and other inmates; *Id.* at 234 and 252;

(5) an April 28, 1997, report of an infractions board hearing which indicates that Mr. Copas pled guilty to fighting with his then-cellmate Mr. Sanders and admitted that there was tension in the cell; the report also indicates that as a result of the proceedings, Mr. Copas was placed in disciplinary control for nine days; *Id.* at 235 and 253;

(6) a May 7, 1995, statement from inmate Brent Brown describing an incident during which Mr. Copas threatened to kill him because, according to Mr. Copas, Mr. Brown was a "snitch"' *Id.* at 236 and 254;

(7) a June 1, 1995, incident report in which a teacher, Mrs. Ransome, described an incident during which Mr. Copas "made kissing sounds at [her]" and later followed her across the yard "as if stalking [her]", all making Mrs. Ransome feel threatened; *Id.* at 237 and 255;

(8) a report from a June 15, 1995, disciplinary hearing during which Mr. Copas denied stalking Mrs. Ransome and trying to have a relationship with her; the report also indicates that the discipline committee believed that Mr. Copas' presence in the general population would likely disrupt the orderly operation of the institution; as a result of the hearing, Mr. Copas was placed in Security Control and Warden Rex Zent made a notation "transfer to another facility ASAP"; *Id.* at 238 and 256;

(9) a June 15, 1995, memorandum from Deputy Warden Ms. Brooks to Mr. Copas advising him that the Local Control Committee had recommended that he be placed in Local

Control due to his attempt to establish a relationship with Ms. Ransome; the memorandum indicates that Warden Zent disapproved the Committee's recommendation and, instead, placed Mr. Copas in Security Control; Warden Zent again made the notation "transfer to another facility ASAP"; *Id.* at 239 and 257;

(10) an October 11, 1995, Hearing Officer's report which reflects that he determined that there was probable cause to believe that Mr. Copas had violated two rules by writing letters of a threatening nature to one Kimberly Ransome, a teacher at Marion Correctional Institution; *Id.* at 240 and 258;

(11) a September 22, 1995, Conduct Report which reflects that Mr. Copas sent a "kite" to a prison officer indicating that he was going "to get that damn teacher for what she has done" and stating that if he was not transferred he would "show his true colors"; *Id.* at 241 and 259;

(12) an October 11, 1996, conduct report prepared by Neil Howard, a corrections officer, indicating that he had investigated an incident in the cell which Mr. Copas and Inmate Carter shared, that he believed that the two had been fighting, that he sent both inmates to the captain's office, and that subsequently Mr. Copas was placed in Security Control; *Id.* at 242 and 260;

(13) an October 12, 1995, conduct report prepared by Lynn Goff indicating that Mr. Copas violated institution rules when he placed an envelope in the outgoing mail and that he had used another inmates name and number as a return address and when he attempted to send cassettes to Kimberly Ransome; *Id.* at 243 and 261.

In addition to the above referenced materials, Mr. Hanna complains that Trooper Ertel's investigative report contained notes of interviews of other inmates which his counsel did not

receive until the time of the post-conviction proceedings. Mr. Hanna points particularly to the statements of two of the State's witnesses who testified at trial, inmates Bryan Freeze and Ricardo Lee.

During the course of investigating the killing of Mr. Copas, the investigating officers interviewed sixty-nine inmates, including Mr. Freeze and Mr. Lee . Appendix, Vol. IV at 101-11; 158-59. Of the sixty-nine inmates interviewed: (1) twenty-nine had no knowledge of the incident and made no comments as to either Mr. Hanna or Mr. Copas[1]; twenty-six heard what they variously described as screaming, "someone getting their ass kicked", someone "calling for a C.O.", and "a commotion"[2]; eleven made general comments about Mr. Copas and/or Mr. Hanna based on their own experiences and/or observations such as, "Mr. Hanna kept to himself", "Mr. Hanna was a non-nonsense-type person", Mr. Hanna "said someone was touching his stuff", Mr. Copas "was a trouble-maker", Mr. Hanna "had a problem celling with people", Mr. Copas was "quiet and didn't say much", and that Mr. Hanna and Mr. Copas "had problems before the stabbing"; additionally, around the time of the incident, some of these eleven inmates also heard yelling and screaming[3]; and one made specific statements with respect to the incident: Inmate Stark reported that he knew Mr. Hanna by face, that he (Inmate Stark) was coming from the kitchen and heard someone screaming, "Help me, he is sticking me." Inmate Stark also reported that he saw Mr. Hanna's "hand going

---

[1] They included Inmates Jude, Paxton, Britton, Whaley, Rhodes, Cooksey, Huston, Henry, Kennedy, Lewis, Furlough, Hutchinson, Westfall, Hartley, Payne, Sparks, Easter, Williams, Morris, Gray, Harris, Furlow, Davis, Terbueggen, McMains, Taylor, Maynard, Wright, and McCoy.

[2] They included Inmates Wilson, Butler, Williams, Malone, Johnson, Valentine, Bryant, Royal, Smith, Moon, Byrd, Jones, Lambert, Washington, Toda, Conrad, Brown, Linville, Green, Grant, Pullum, Stankorb, Washington, Ash, Simpson, and Cargle.

[3] They included Inmates Clark, Barbour, Walker, Woods, Queen, Foreman, Commer, Smith, McLearran, Smith, and Gastor.

toward Copas' face" and that Mr. Copas "fell out of the door and laid there." Appendix, Vol. IV at 101.

As noted above, Mr. Hanna points particularly to the statements from Inmate Freeze and Inmate Lee which are in Trooper Ertel's investigative file.

Inmate Freeze told the investigator who interviewed him that he was Mr. Hanna's prior cellmate, Mr. Hanna "was crazy", he (Inmate Freeze) remembered an incident when he woke up in the middle of the night and found Mr. Hanna staring at him, and that Mr. Hanna told him that he wanted to "do something for [him]" meaning sexually. Appendix, Vol. IV at 103. Mr. Freeze also told the investigator that Mr. Hanna had told him that "he had killed someone and that these 'mothers' don't know who I am", that he had "stabbed his cellie while he was asleep" and that Mr. Copas "had started off screaming, 'help me, help me', a little after 6:00 in the morning", that "the 'motherfucker' fell off his bunk and now [was] yelling 'help me, help me, don't let me die, he is going to kill me' ", and that he (Mr. Hanna) had stabbed Mr. Copas "in his eye, in his head, because he turned his TV off on him". *Id.*

The investigator's report about his interview with Mr. Lee reads:

I knew Inmate Peter Copas through conversations with him about sports. We were both Bengal and Reds fans. Copas and I were going to cell together on the first range when we could set it up. Copas was moved into Inmate Hanna['s] cell without Inmate Hanna's approval. Inmate Copas come to me and said that he and Hanna were having trouble, I went up to Inmate Hanna's cell 2-K-18 and talked to him. I went to the cell to talk to Hanna about Copas not having a choice about his cell move and I asked that Inmate Hanna have patience with Copas, that he was not wanting any trouble. Hanna listened to what I was saying, and seemed to agree to let Copas stay in the cell for a while.

At the chow hall a little later on, Copas came to me and said, "This isn't working out, I have to move out of this cell".

36

Within a day or two, before Copas was assaulted Hanna came to my cell. Hanna said to me "You better get him, my wits are this close" (at this point he made a sign with his fingers showing how close he was to losing his cool). Hanna left and went into the shower.

Later that day I saw Inmate Hanna in the day room. I went to Hanna and said, "Me and Copas are not tight, but I just want to cell with him because of Copas' TV and watching sports".

I went to Copas old cellmate and talked to him. I told him that I wasn't "tight" with Copas but that I just wanted to watch TV.

Q) Did you ever threaten Hanna about letting Copas to stay in his cell?

A) No

Q) Did you talk with Hanna about his TV being broken by Copas.

A) Yes, I told him that if Copas broke it, I would help pay to fix it and would come and take it to get fixed.

*Id.* at 158-59.

Mr. Hanna also alleges that his counsel were prevented from knowing about evidence related to his defense that the medical staff's negligence ultimately caused Mr. Copas' death. Specifically, Mr. Hanna refers to the handwritten statement of LCI Officer Lawrence Hager contained in Trooper Ertel's report which, according to Mr. Hanna, would have been impeachment material with respect to infirmary nurse Linda Young who testified at trial that the lacerations she observed on Mr. Copas were "really not severe". Transcript, Vol. VI at 837.

Officer Hager's report reads:

Sir, on the above date and approximately 6:10 AM I Officer Hager responded to a signal three in K-Block where lying on the range in front of his cell bleeding from his hand was inmate Copas 237-711. His cellmate Hanna 152-169 was removed from his cell and cuffed by other officers. Both were taken to the Infirmary where I stood watch over inmate Copas 237-711 who was covered about the head

in blood mostly dried.  While Copas was being cleaned up [and] checked I overheard the nurse say that Copas wounds looked to her about two hours old and deep.  Lt. Sherman who was also present at the time said that inmate Copas smelled [and] appeared intoxicated to him.  When asked by myself [and] Lt. Sherman as to what happened to him inmate Copas made no statements or responses to us do [sic] to being mostly unconscious.  Inmates Copas and Hanna were kept seperated [sic] while in the Infirmary.  No statements were heard by this officer from inmate Hanna while in the infirmary.

Appendix, Vol. VI at 162.

Finally, Mr. Hanna claims that the state's failure to disclose that Mr.  Lee refused to testify at trial unless he was transferred to a different facility and the subsequent agreement to transfer Mr. Lee to another facility was a *Brady* violation.

As noted above, any materials which the state produced during the trial simply cannot be the subject of a *Brady* violation; that is, the principles announced in *Brady* do not apply to a *tardy* disclosure of information, but to a *complete* failure to disclose.  *Norris,* 146 F.3d at 333 (emphasis supplied).  Accordingly, there was no violation of *Brady* with respect to any materials which the state produced to Mr. Hanna's counsel during the trial.  Nevertheless, this Court will address those documents to which Mr. Hanna specifically refers and which the Court has described above.

The Court first turns to the documents which, as numbered 1 through 13 and described above, apparently came from Mr. Copas' prison record.  Mr. Hanna's position is that those documents are *Brady* material because they tend to establish that Mr. Copas was the kind of cellmate who produced tension and violence with numerous cellmates.

In addressing and rejecting Mr. Hanna's Second Ground for Relief, *supra,* this Court noted that the Twelfth District Court of Appeals determined that the materials numbered above as 1 through 13 contained in Mr. Copas' prison record displayed no connection between Mr. Hanna

and Mr. Copas and that there was no evidence that appellant had knowledge of incidents in Mr. Copas' file. See 2008 WL 4529 at **6-*7. The state court also determined that there was no indication as to how the contents of Mr. Copas' file would provide evidence of provocation in the guilt phase or mitigation in the penalty phase. *Id.* This Court agrees with the court of appeals' analysis of those materials and on that basis concludes that the materials are not *Brady* material.

With respect to the reports in the investigative file of the various interviews with the other inmates, as noted above, twenty-nine of those inmates interviewed had absolutely no knowledge of the incident and did not make any comments about either Mr. Hanna or Mr. Copas. In addition, twenty-six inmates said only that they heard various kinds of noise described as screaming, someone calling for a C.O., a commotion, and so forth. Further, eleven inmates made general comments about either Mr. Hanna or Mr. Copas and some of those eleven heard noises. None of these statement contained any exculpatory materials whatsoever. Finally, Inmate Stark's statement, if anything, is inculpatory in that he stated that he saw Mr. Hanna's "hand going toward Copas' face". Even assuming there was a failure to produce these materials, there was no *Brady* violation.

While the state produced Mr. Freeze's statement and Mr. Lee's statement during trial, the state produced them *after* Mr. Freeze and Mr. Lee had testified and *after* Mr. Hanna's counsel had the opportunity to cross-examine those witnesses. A review of the transcript shows that Mr. Hanna's counsel did not move to recall either witness after having the opportunity to review their respective statements. Nevertheless, an argument could be made that the state's failure to produce the statements prior to the cross-examinations provided a basis for a *Brady* claim. However, this Court concludes that nothing in either Mr. Freeze's statement or in Mr. Lee's statement would be

impeachment material. Quite to the contrary, Mr. Freeze's statement is, in fact, inculpatory in nature in that Mr. Freeze told the investigators that Mr. Hanna had, in essence, told him how he had assaulted Mr. Copas. Similarly, Mr. Lee's statement is, rather than impeachment material, a basis for establishing that Mr. Hanna did not want to be Mr. Copas' cellmate, that he was becoming impatient with Mr. Copas, and that Mr. Hanna conceivably believed that Mr. Copas had broken his television which could be construed as reasons for Mr. Hanna's anger and frustration with Mr. Copas which culminated in the attack. For these reasons, neither Mr. Freeze's statement nor Mr. Lee's statement is *Brady* material.

As to LCI Officer Lawrence Hager's report, as noted above, Mr. Hanna's position is that Officer Hager's report was impeachment material in that at least a part of that report went to the issue of medical negligence. However, for the same reasons that this Court finds Mr. Hanna's Seventh Ground for Relief to be meritless, *infra*, Officer Hager's report was not impeachment material. More particularly, because medical negligence was not a proper defense available to Mr. Hanna, impeaching the infirmary nurse as to her description of Mr. Copas' wounds was immaterial. *See also, Hanna,* 95 Ohio St.3d at 293-95.

Finally, this Court will address Mr. Hanna's argument that the state's failure to disclose its alleged agreement with Mr. Lee was a violation of *Brady.* In a letter dated June 17, 1998, Mr. Lee advised prosecutor Kenneth Ewing that he (Mr. Lee) had "only one single objection to the situation with respect to me being a witness for the state" and that it concerned his "overall safety" while he was at the Lebanon Correction Institute because other inmates learned he was a cooperating witness. Transcript Evidentiary Hearing, Mar. 20, 2007, Petitioner's Ex. 8 thereto (Doc. 105). Mr. Lee also informed Mr. Ewing that he thought that he did not have "sufficient protection"

from the other inmates and he had "no safety" while at Lebanon. *Id.* Mr. Lee "[demanded] to be transferred to another prison or [he would] refuse to honor any subpeanoe [sic] from this court in regards to the Hannah [sic] case". *Id.* Essentially, Mr. Lee demanded to be transferred to another facility in exchange for his testimony at Mr. Hanna's trial.

In a June 26, 1998, letter to Mr. Ewing, Mr. Lee, who had apparently been transferred to the Warren Correctional Institute, advised Mr. Ewing that he was "satisfied and ready to carry out [his] duty as a competent witness since [he was] out of Le. C. I." *Id.*, Petitioner's Ex. 9. Mr. Lee also advised Mr. Ewing that he was "pleased with his living conditions and [ ] available at anytime." *Id.*

Mr. Hanna's position is that the state's failure to disclose its agreement with Mr. Lee to transfer him out of Lebanon Correctional Institute was a *Brady* violation.

As noted above, an express agreement between the prosecution and a witness is possible impeachment material that must be turned over under *Brady* as is the existence of a less formal, unwritten or tacit agreement.

If Mr. Hanna could prove that Mr. Lee and the prosecutor had reached a mutual understanding or agreement, even if unspoken, that Mr. Lee would provide testimony only in exchange for some sort of favorable treatment, then such an agreement could be considered impeachment material under *Brady*. However, this Court concludes that Mr. Hanna is unable to do so.

First, the Court notes that, unlike the facts in *Bell,* 512 F.3d at 233, the Sixth Circuit's most recent pronouncement with respect to *Brady* and an agreement between the prosecutor and a state's witness, Mr. Lee did not contact the prosecutor and offer his testimony in the hope of

receiving a benefit in exchange for that testimony. Rather, Trooper Ertel's report reflects that the investigating officers interviewed all of the inmates who were on the cellblock when Mr. Copas' killing took place. Mr. Lee was one of the sixty-nine inmates interviewed.

Second, although the June 17 and 26, 1998, letters from Mr. Lee to Mr. Ertel may indicate that Mr. Lee may have been seeking special consideration in exchange for his testimony, there is no evidence of a corresponding assurance or promise from Mr. Ertel. Mr. Ertel testified at the March 20, 2007, Evidentiary Hearing before this Court that he had met with Mr. Lee concerning his potential testimony and that Mr. Lee was concerned about his safety at the Lebanon facility if he were to testify. Transcript of Evidentiary Hearing, Mar. 20, 2007 ("Habeas Hearing Transcript"), at 68 (filed Apr. 10, 2007) (Doc. 105). Mr Ertel testified further that he did not confer any benefit on Mr. Lee such as a reduction in a sentence in exchange for his testimony. *Id.* at 70. Mr. Ertel also testified that he did not consider a transfer to another facility a benefit in exchange for testimony but rather it was a security consideration. *Id.* at 70-71. Finally, Mr. Ertel testified that he had absolutely nothing to do with Mr. Lee's transfer from the Lebanon facility to the Warren facility and he could not explain how or why Mr. Lee was transferred from one facility to another within a nine day period. *Id.* at 71.

Mr. Ertel's testimony before this Court is uncontradicted. Although Mr. Lee may have been expecting a transfer from the Lebanon facility to the Warren facility in exchange for his testimony at Mr. Hanna's trial, this Court finds no corresponding assurance or agreement from the prosecutor. *See, Bell,* 512 F.3d at 233. Mr. Hanna has not adequately demonstrated the existence of an understanding or agreement, express or otherwise, between Mr. Lee and Mr. Ertel concerning Mr. Lee's testimony at trial or indeed any power on Ertel's part to deliver on such an agreement if

he had made one.  Without an agreement, no evidence was suppressed, and the state's conduct, not disclosing something it did not have, cannot be considered a *Brady* violation.  *See, Bell,* 512 F.3d at 234.

The state court's decision as to Mr. Hanna's *Brady* claims in his Third Ground for Relief was not contrary to or an unreasonable application of clearly established federal law. Therefore, Mr. Hanna's Third Ground for Relief should be denied.

# Fourth Ground for Relief

**Petitioner Hanna was denied the right to effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution when his Trial Counsel failed to investigate and present adequate mitigation evidence during the penalty phase.**

**A.  Trial counsel failed to utilize the services of an expert witness to explain the culture of prison life.**

**B.  Trial counsel was ineffective when they failed to investigate and utilize the knowledge and experience of prison employee James Scurlock regarding his positive experiences with Petitioner in prison.**

**C.  Trial counsel were ineffective when they failed to present evidence of the criteria for placing a prisoner in a maximum security prison where he would be prevented from harming another inmate.**

**D.  Trial counsel were ineffective when they failed to provide to mitigation psychologist Dr. Kathleen Burch all relevant, available documentation about Petitioner.**

**E.  Trial counsel were ineffective when they failed to investigate and present significant mitigation evidence.**

In his Fourth Ground for Relief, Mr. Hanna claims that, for various reasons, his counsel were ineffective during the mitigation phase of his trial.  The Respondent concedes that none of these claims are procedurally defaulted.

The governing standard for effective assistance of counsel, claims which Mr. Hanna raises in both his Fourth Ground for Relief as well in his Fifth Ground for Relief, *infra*, is found in *Strickland v. Washington,* 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that the counsel's performance was deficient.  This requires showing that counsel was

44

not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

Judicial scrutiny of counsel's performance must be highly deferential.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id.* at 689.

As to the second prong, the Supreme Court said:

The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to overcome confidence in the outcome.

*Id.* at 694; see also, *Darden v. Wainright,* 477 U.S. 168 (1986); *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998).

In *Wiggins v. Smith,* 539 U.S. 510 (2003), the Court recognized that the American Bar Association's (ABA) Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases provide the guiding rules and standards to be used in defining the prevailing

professional norms for purposes of ineffective assistance of counsel claims.  The 1989 Guidelines

adopted as "prevailing norms" in *Wiggins* merely represent

> ...[A] codification of longstanding, common-sense principles of
> representation understood by diligent, competent counsel in death
> penalty cases.  The ABA standards are not aspirational in the sense
> that they represent norms newly discovered after *Strickland*.  They
> are the same type of longstanding norms referred to in *Strickland* in
> 1984 as "prevailing professional norms" as "guided" by "American
> Bar Association standards and the like." ... The Court in *Wiggins*
> clearly holds ... that it is not making "new law" on the ineffective
> assistance of counsel either in *Wiggins* or in the earlier case on which
> it relied for its standards, *Williams v. Taylor*, 529 U.S. 362 ... (2000).

*Hamblin v. Mitchell,* 354 F.3d 482, 486 (6th Cir. 2003).

The Supreme Court has found more limited investigations into a defendant's

background justified where any evidence presented would have a "double edge".  *Wiggins v. Smith,*

539 U.S. 510, 535 (2003)(citation omitted).   It is not even deficient performance, let alone

prejudicial, for trial counsel to fail to introduce evidence of a defendant's background that "would

likely make him look even worse to the jury".   *Carter v. Mitchell,* 443 F.3d 517, 532 (6th Cir. 2006).

### Subclaim "A"

 In Subclaim "A" of his Fourth Ground for Relief, Mr. Hanna alleges that his trial

counsel were ineffective when they failed to utilize the services of an expert witness to explain the

culture of prison life.  Mr. Hanna's position is that, "testimony from a prison expert who had

reviewed both Hanna's and Copas' records would have answered some of the questions that had to

be in the jurors' minds [ ], would have given a more complete picture of Hanna's background and

would have put him into the context where the crime occurred."

Mr. Hanna raised this claim in post-conviction and the appeals court rejected it as

follows[4]:

> In support of the contentions in his PCR petition, appellant provided the trial court with approximately twenty-eight items. The items include ... affidavits from ... prison experts [Mr. Martin] and prison personnel [Mr. Scurlock]... .

> Before a hearing is warranted, the petitioner must demonstrate that the claimed errors resulted in prejudice. *Calhoun, 86 Ohio St. 3d at 283.* The decision to grant the petitioner an evidentiary hearing is left to the sound discretion of the trial court. 86 Ohio St. 3d at 284. The trial court determined appellant's evidence was insufficient to set forth operative facts to establish substantive grounds for relief. Consequently, the trial court determined the evidence did not demonstrate a cognizable claim of constitutional error that resulted in prejudice to appellant. Therefore, the trial court determined a hearing was not required before dismissing the PCR petition.

> The trial court concluded appellant alleged no operative facts to indicate ... a reasonable probability that the referenced items would result in different findings by the jury ... [or] that trial counsels' presentation violated the standards of *Strickland v. Washington* (1984), 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 ... . Upon review of the evidence, we find that the trial court's decision was not unreasonable, arbitrary, or unconscionable. Therefore, a hearing was not required before dismissal of the PCR petition.

*Hanna,* 2002 WL 4529 at*3-4.

Mr. Hanna's position is that the testimony of Steve J. Martin, which he presented in the post-conviction proceedings by way of an affidavit dated December 15, 1999, illustrates how he was prejudiced by his counsels' failure to engage the services of a prison culture expert. Mr. Hanna particularly points to Mr. Martin's opinion with respect to the stress that develops when two

---

[4] Mr. Hanna raised a *similar*, but different claim on direct appeal. On direct appeal, Mr. Hanna alleged that his counsel were ineffective for failure to engage the services of a prison culture expert to testify as to the conditions of confinement Mr. Hanna would face if he were sentenced to life without parole. *See*, Appendix, Vol. III at 85-87 (Brief on Appeal to the Ohio Supreme Court, Proposition of Law No. 11, Subclaim "F"). However, in his post-conviction proceedings, Mr. Hanna raised the claim that he raises here; that is, that his counsel were ineffective for failing to engage the services of a prison culture expert to testify as to prison life so that the jury could better understand the background of the incident. *See,Id.*, Vol. IV at 39-41 (Post-Conviction Petition, Seventh Ground for Relief); *Id.*, Vol. VI at 66-67 (Brief on Appeal of Denial of Post-Conviction Petition).

(2) individuals such as he and Mr. Copas are forced to cell together and with respect to the prison officials' responsibility for matching cellmates by their classification levels and known histories and how they failed to do so in this case.

In addition to discussing prison life in particular, Mr. Martin's affidavit also contains the following information:

> 1) Since Mr. Hanna has been institutionalized in high security prisons for over 20 years, it is of paramount importance to understand the effects of long-term confinement on such persons.
>
> 2) Mr. Hanna has spent the vast majority of his adult life incarcerated. As a young adult he was first incarcerated in 1966 on a burglary conviction. Shortly after his parole, he was arrested and later convicted of armed robbery (1970). He was paroled in April, 1977, and in August the same year was charged with aggravated murder and aggravated robbery. He was convicted in 1978, and received a life sentence having now been confined for 21 years without release. During this period of incarceration, he incurred numerous institutional disciplinary violations
>
> 3) Mr. Hanna has on occasion relied on the threat of violence to maintain and protect his place in the prison order;
>
> 4) Casework and classification personnel have repeatedly documented Mr. Hanna's predilection for explosiveness if heavily stressed by other inmates. Some fifteen (15) years before he assaulted Mr. Copas, Mr. Hanna attempted to assault another inmate in the same fashion after that inmate had spat on Mr. Hanna.

Appendix, Vol. IV at 205-11.

In addition to the affidavit which Mr. Martin provided during the post-conviction proceedings, he testified at the evidentiary hearing before this Court[5]. Habeas Hearing Transcript (Doc. 105). At that time, Mr. Martin essentially testified that: (1) putting Mr. Hanna and Mr. Copas

---

[5] The Court is assuming, without deciding, that Mr. Martin is an expert within the meaning of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1992).

in the same cell was ill advised; (2) the hallmark feature of Mr. Hanna's record is that he has been institutionalized or incarcerated during a time span of some four decades; (3) when his routine and regimentation were threatened, Mr. Hanna could become fairly protective of his environment which could give rise to violence which it obviously has on numerous occasions; (4) Mr. Copas was relatively new in terms of institutionalized living and his record indicated that he was a troublesome inmate in terms of inmate interaction; (5) placing Mr. Hanna in stressful situations could give rise to explosive behavior; (6) he based his conclusions on his reviews of Mr. Hanna's and Mr. Copas' prison records, did not interview either Mr. Copas or Mr. Hanna, and did not interview either inmate's family; (7) Mr. Hanna's records reflect a prior incident of his attempt to stab another inmate; (8) that another inmate in the cell with Mr. Hanna could also have done the same acts as Mr. Copas did which aggravated Mr. Hanna; (9) Mr. Hanna was not justified in killing Mr. Copas; (10) Mr. Hanna was not a "fabulous prisoner". *Id.* at 24-58.

First, the Court notes that Mr. Hanna has completely failed to identify the questions "that had to be in the jurors' minds" which a prison culture expert's testimony would have answered. However, even if he had identified, or even formulated, such questions, that argument is purely speculative.

Second, in view of the above cited information contained in Mr. Martin's affidavit, as well as his testimony before this Court, the Court cannot say that Mr. Hanna's counsel were deficient for not using a prison culture expert. Indeed, Mr. Martin's affidavit and testimony are arguably more damaging to Mr. Hanna than they are helpful. It simply cannot be said that counsel were ineffective for not introducing testimony about Mr. Hanna's propensity for violence, his predilection for explosiveness, his history of numerous prison disciplinary violations, and his history

of attacking another inmate in a manner similar to the attack he made on Mr. Copas, or his own

expert's opinion that the killing was not justified.

Finally, Mr. Hanna has simply failed to establish how he was prejudiced by counsels'

failure to engage the services of a prison culture expert. Aside from the speculative nature of Mr.

Hanna's position, although he identifies several things that a prison culture expert's testimony *could*

have done, such as answering the questions that "had to be on the jurors' minds", shifting to the

prison officials some of the "moral responsibility" for the situation which gave rise to his attack on

Mr. Copas, giving the jurors an understanding of the dynamics at work in the cell he shared with Mr.

Copas, and showing the jurors that a cell dispute is a very serious and potentially dangerous situation

in prison, Mr. Hanna has not explained how the verdict would have been different in light of such

proposed testimony.

Certainly, Mr. Martin's testimony would have a "double edge", *Wiggins,* 539 U.S.

at 535, and would likely make Mr. Hanna look even worse to the jury. *Carter,* 443 F.3d at 532.

It was not even deficient performance, let alone prejudicial, for trial counsel to fail to introduce this

evidence of Mr. Hanna's background. See *Id.*

Mr. Hanna has failed to satisfy his burden under *Strickland* and Subclaim "A" in his

Fourth Ground for Relief is without merit

### Subclaim "B"

In Subclaim "B" of his Fourth Ground for Relief, Mr. Hanna argues that his counsel

were ineffective for failing to investigate and utilize the knowledge and experience of prison

employee James Scurlock regarding his positive experiences with Mr. Hanna.

Mr. Hanna raised this claim in post-conviction and the appeals court rejected it on

the same basis that it rejected his claim that counsel were ineffective for failing to engage the services of a prison culture expert. *See,* Subclaim "A", *supra*. Stated differently, the court rejected it on the basis that Mr. Hanna failed to establish how the results of the trial would have been different had Mr. Scurlock's testimony been introduced at trial.

In his post-conviction affidavit dated December 16, 1999, Mr. Scurlock, a Mental Health Administrator at the Lucasville facility, essentially testified that: (1) he first had contact with Mr. Hanna in 1971; (2) since that first meeting, he had monitored Mr. Hanna's activities at Lucasville for several years: (3) that Mr. Hanna was shy, appeared to not trust staff, stayed to himself, did not abuse his requests for services; (4) he (Mr. Scurlock) did not remember seeing Mr. Hanna being hostile or angry; (5) Mr. Hanna was always cooperative and was not a troublemaker; (6) Mr. Hanna was known to be a good worker; (7) whenever he received "kites" from Mr. Hanna requesting he be moved to a different cell, he (Mr. Scurlock) would try to move him because he took his request seriously; (8) he would not have left Mr. Hanna in a cell for four days with an inmate he (Mr. Scurlock) knew was a problem. Appendix, Vol. IV at 220-22.

At the hearing before this Court, Mr. Scurlock testified that: (1) when he was a corrections officer, he knew Mr. Hanna and then at Lucasville he was Mr. Hanna's social worker for about two years; (2) if he were ever going to wait for a kite from Mr. Hanna, he probably wouldn't get one; (3) the only time [a prison official] heard from Mr. Hanna was when he had some kind of problem with another inmate; (4) Mr. Hanna wasn't the kind of inmate who came forward and he was very quiet; (5) if Mr. Hanna came forward with a problem, it was usually serious; (6) Mr. Hanna was never one to pull a con game; (7) whenever Mr. Hanna requested a cell change, it was usually because his cellmate was doing something, pressuring him for various things, or there were

personality clashes; (8) Mr. Hanna was a very neat person as far as keeping his cell clean; (9) it's basically an old rule of the prison that you just don't mess with another inmate's property; (10) when he (Mr. Scurlock) signed his affidavit which states that Mr. Hanna was not angry or hostile, was cooperative, was a good worker, and was not a troublemaker, he knew that Mr. Hanna was incarcerated for aggravated murder, attempted aggravated murder, and aggravated robbery, that in 1977, Mr. Hanna walked into a 7-Eleven and robbed the clerk at knife point, stabbed Ed Tucker and stabbed Harvey Blix 37 times, and that he committed that crime while on parole; (11) at the time he signed his affidavit, he was also aware that Mr. Hanna had attempted to stab another inmate in about the mid-1980s; (12) if Mr. Hanna was having a problem with his cellmate and nothing was done for several days, Mr. Hanna would become violent.  Habeas Hearing Transcript at 5-23.

First, this Court notes that Mr. Scurlock's affidavit testimony and hearing testimony are somewhat inconsistent.  For example, although he testified in his affidavit as to Mr. Hanna's tendencies to be shy, to stay to himself, to be a good worker, and to be cooperative, that he was not a troublemaker and that he did not know Mr. Hanna to be hostile or angry, at the hearing, Mr. Scurlock testified that at the time he prepared his affidavit, he knew that Mr. Hanna was incarcerated for aggravated murder, aggravated attempted murder, and aggravated robbery, that in 1977, Mr. Hanna walked into a 7-Eleven and robbed the clerk at knife point, stabbed Ed Tucker and stabbed Harvey Blix 37 times, and that he committed that crime while on parole. Mr. Scurlock also testified at the hearing that he was aware that Mr. Hanna had attempted to stab another inmate in about the mid-1980s, and that if Mr. Hanna was having a problem with his cellmate and nothing was done for several days, Mr. Hanna would become violent.

Second, had Mr. Hanna's counsel called Mr. Scurlock as a mitigation witness for

the purpose of establishing Mr. Hanna's tendencies to be shy, to stay to himself, to be a good worker, and to be cooperative, that he was not a troublemaker, and that he was not hostile or angry, counsel would have "opened the door" to Mr. Hanna's past convictions, his past bad acts within the prison setting, and his tendencies to be hostile, explosive, and violent. See *Clark v. Mitchell,* 425 F.3d 270, 286 n. 6 (6th Cir. 2005); see also, OhioEvid.R. 404(A); OhioEvid.R. 405(A).

Finally, as with Subclaim "A", Mr. Hanna has failed to show how the results of his mitigation trial would have been different had his counsel called Mr. Scurlock as a witness.

As with Mr. Martin's testimony, see, Subclaim "A", *supra*, certainly, Mr. Scurlock's testimony would have a "double edge", *Wiggins,* 539 U.S. at 535, and would likely make Mr. Hanna look even worse to the jury. *Carter,* 443 F.3d at 532. It was not even deficient performance, let alone prejudicial, for trial counsel to fail to introduce this evidence. See *Id.*

### Subclaim "C"

In Subclaim "C" of his Fourth Ground for Relief, Mr. Hanna alleges that his trial counsel were ineffective for failing to investigate whether there was a formal policy regarding the placement of prisoners in high maximum security in Ohio and they were therefore unaware of the existence of the Ohio Department of Rehabilitation and Correction's ("DRC") Policy No. 111-07. Mr. Hanna's position is that his trial counsel should have been prepared to back up their argument in mitigation that he would be going to a supermax prison if spared the death penalty.

Mr. Hanna raised this issue in his post-conviction proceedings and the trial court rejected the claim stating:

> Petitioner contends his counsel's performance in failing to present
> Department of Corrections Policy #111-07 was Constitutionally

53

deficient.

The defense did present evidence from Trooper Ertel about the housing of prisoners in single cells and confinement for twenty-three hours of twenty-four hours at the Youngstown Facility. Further, he testified that inmates were moved around the facility with three guards. (Tr-1630-33).

He also testified that prisoners are single celled at Lucasville; that inmates are shackled when they come out of their cells and escorted by at least one guard. (Tr-1637).

The Petitioner described for the jury his confinement and movement which was tantamount to isolation. (Tr-1640).

The policy relied on by the Petitioner would have offered no more to the jury than the testimony provided. The policy does not outline what the conditions of confinement would be; it requires a recommendation based upon a subjective determination of behavior; and it allows for reclassification to a lower level of security.

There are insufficient facts from which it can be determined that counsels' conduct breached the standards of *Strickland*.

Appendix Vol. V at 345-46.

The subject of DRC Policy No. 111-07, which Mr. Hanna attached to his Post-

Conviction Petition as Ex. G, is "High Maximum Security". The Policy reads in part:

I. AUTHORITY:

This policy is issued in compliance with the Ohio Revised Code, 5120.02, which delegates to the Director the authority to manage and direct all inmates, personnel, volunteers, programs, and activities connected with the department and its institutions.
...

V. POLICY:

ODRC will assign inmates to high maximum security status as a classification process. Inmates who are assigned to this status will be housed at the Ohio State Penitentiary.
...

VI. PROCEDURES:

A. Assignment Criteria. Inmates will be recommended for and assigned to high maximum security when all of the following factors are present:

1. The inmate is or is about to be classified as maximum security;

2. The inmate has demonstrated behavior which meets high maximum security criteria as defined in paragraph B. below; and

3. The inmate presents the highest level of threat to the security and order of the department and its institutions, in the professional judgment of the classifying official.

4. An inmate who has demonstrated these factors will be recommended to high maximum security status as an administrative override of the classification instrument.

B. Behavior Criteria. An inmate will be considered for assignment to high maximum security status of the inmate's behavior has demonstrated any of the following:

1. The inmate's conduct or continued presence at the current institution poses a serious threat to the physical safety of any person, or to the security of the prison;

2. The nature of the inmate's criminal offense indicates that the inmate poses a serious threat to the physical safety of any person, or to the security of the prison;
...

Appendix, Vol. IV at 223-25.

During the mitigation phase of Mr. Hanna's trial, Trooper Ertel testified that at the

maximum security institution in Youngstown, Ohio, a prisoner is housed individually, is in his cell

for up to 23 hours a day, and that a prisoner is accompanied by three guards when he is moved about

the facility. Transcript, Vol. X at 1630-38. Trooper Ertel also testified that the Lucasville facility

was considered a maximum security institution; a prisoner at Lucasville is housed in a single cell;

during mass movement of prisoners, there is more than one guard accompanying the prisoners, and that when a single prisoner is moved, he is shackled and accompanied by one guard. *Id.* Trooper Ertel testified further that when he interviewed Mr. Hanna during the investigation, Mr. Hanna said that he wanted to return to the Lucasville facility. *Id.*

In his unsworn statement to the jury, Mr. Hanna described the conditions of his confinement. *Id.* at 1639-40. Specifically, Mr. Hanna told the jury:

> ... Considering the type of isolation and incarceration that I exist under these days, weeks, months and years, I foresee no human contact other than corrections officers and officials, with most of that being strictly limited to visual contact alone.
>
> My confinement consists of a steel cement bed, mattress with bedding, light fixture, toilet and sink combination, but without a window for fresh air, just the vent circulated variety in my cell.
>
> Besides exercise and showers each and every week in lockdown-type condition, 23 hours of each day I will be confined solely to my cell location.
> ...
>
> If I get a life sentence, I will go to a super maximum prison where I will stay isolated from others except contact with guards.

*Id.*

During deliberations, the jury asked the following question, "If given a life sentence, how is it assured it will be served in a maximum security prison? How will we be assured he will be in his cell 23 hours a day?" *Id.* at 1714. The court responded to the jury's question as follows, "The response the court has for you, ladies and gentlemen, is that I cannot supply you with other information. You have received all the evidence in this case. You must base your decision on that evidence and the instructions of the court." *Id.* at 1714-15.

Clearly, DCR Policy No. 111-07 is an administrative tool which DCR personnel use

in determining whether to place a prisoner in a supermax facility or to, conversely, reclassify a prisoner to a lower level of security. The Policy provides that recommendations for security classification of prisoners are to be based on subjective criteria such as the inmate presenting the highest level of threat to the security and order of the department and its institutions "in the professional judgment of the classifying official", the inmate's conduct or continued presence at the current institution posing a serious threat to the physical safety of any person, or to the security of the prison, and the nature of an inmate's criminal offense indicating that the inmate poses a serious threat to the physical safety of any person, or to the security of the prison. The Policy does not define what is meant by "presenting the highest level of threat to [ ] security and order"or a "serious threat to the physical safety of any person, or to the security of the prison"and the determination of those factors are left to the recommending DCR official. DCR Policy No. 111-07 does not describe the conditions of confinement for a prisoner in a supermax facility.

In contrast, Trooper Ertel testified as to the conditions of confinement at both the Youngstown facility and the Lucasville facility. Specifically, he testified that prisoners are single-celled at both facilities and that prisoners at both facilities are moved under tight security. In addition, Mr. Hanna described for the jury the conditions of his confinement including his physical surroundings as well as the fact that he is essentially isolated from others and is in his cell for 23 hours out of a 24-hour day.

The introduction of DCR Policy No. 111-07 would have added nothing to the evidence before the jury. As noted above, the Policy is based on subjective criteria and provides for the placement of prisoners based on application of that criteria by various, individual DCR officials. In contrast, Trooper Ertel's testimony and Mr. Hanna's statement to the jury described the particular confinement conditions which Mr. Hanna faced, including being in his cell 23 hours out of 24 hours

a day.

Mr. Hanna simply argues that he was "prejudiced when the jury was unable to get a sufficient answer to their deliberation question." DCR Policy No. 111-07 would not have provided a definitive answer to that question and there was no way to assure the jury that Hanna would be confined to his cell 23 hours a day. The jury had been presented with strong evidence that that was a likely result and it is very unlikely that another piece of paper would have impressed that on their minds more strongly. It is very unlikely the verdict would have been different if this policy had been introduced. It was therefore not ineffective assistance of trial counsel to fail to offer it.


### Subclaim "D"

In Subclaim "D" of his Fourth Ground for Relief, Mr. Hanna argues that his counsel were ineffective for failing to provide Dr. Kathleen Burch, the defense mental health expert, with his background and for failing to prepare Dr. Burch to testify about how his psychological and emotional make-up was molded during the thirty years he spent in prison. Mr. Hanna's position is that as a result, the jury was unable to understand the prison conditions that formed him.

Mr. Hanna raised this claim in his post-conviction proceedings and the trial court rejected it as follows:

> Petitioner claims counsel were ineffective in the mitigation phase, contending a failure to properly prepare Dr. Burch to testify as to how his psychological and emotional makeup was molded during his extended incarceration.
>
> As previously noted under the SIXTH GROUND, Dr. Burch testified as to the deficiencies in Petitioner's thought processes and perceptions. Again, as noted, Dr. Burch's presentation was similar to Mr. Martin's affidavit, but presented from a psychological rather than a sociological perspective.

> The existence and presentation of an alternative theory does not constitute ineffective assistance of counsel. *State v. Post, supra.* The facts alleged are insufficient to support a claim of ineffective assistance under *Strickland.*

Appendix, Vol. V at 346-47.

With the exception that in this subclaim, Mr. Hanna is raising a psychological-based claim as opposed to a sociological-based claim, this claim is similar to the claim Mr. Hanna made with respect to counsel being ineffective for failing to hire a prison culture expert. *See* Subclaim "A", *supra.* For essentially the same reasons this Court rejected that claim, it rejects this claim.

First, the Court notes that Dr. Burch testified at Mr. Hanna's trial that she did indeed review his prison records. Transcript, Vol. X at 1590. In addition, Dr. Burch essentially testified that she was aware of the fact that Mr. Hanna had spent a significant portion of his life in prison. *Id.* at 1595-96.

Second, introducing testimony from Dr. Burch about Mr. Hanna spending thirty years in prison and how it molded his psychological make-up would have "opened the door" for the introduction of evidence with respect to Mr. Hanna's propensity for violence as well as the history of his attack on another inmate similar to the attack he made on Mr. Copas. *See*, Subclaim "A", *supra.* Such testimony would have had a "double edge", *Wiggins,* 539 U.S. at 535, and would likely have made Mr. Hanna look even worse to the jury. *Carter,* 443 F.3d at 532. It was not even deficient performance, let alone prejudicial, for trial counsel to fail to introduce this evidence of Mr. Hanna's prison background. See *Id.*

Finally, and again, most importantly, aside from his general statement that he "was prejudiced when the jury never heard a complete analysis of how his psychological make-up was adversely affected by the prison system", Mr. Hanna has not explained how the result of the

mitigation phase of his trial would have been different had his counsel introduced the proposed testimony of Dr. Burch. Mr. Hanna has failed to satisfy the "prejudice" prong of *Strickland*.

### **Subclaim "E"**

In this Subclaim, Mr. Hanna argues that his counsel were ineffective when they failed to interview or adequately interview members of his family who were available and would have testified on his behalf. Mr. Hanna specifically points to his sisters Nancy LaDuke and Beverly Whitney and his brother Willard Hanna, arguing that testimony from those individuals would have allowed the jury to understand the kind of life he had endured and the familial tragedies he suffered.

Mr. Hanna raised this claim on direct appeal and the Ohio Supreme Court rejected it stating:

> Appellant also complains about his attorneys' failure to present evidence about his child abuse.
>
> Patricia Cutcher, appellant's sister, testified that their mother was a harsh disciplinarian and mentioned that appellant was sexually abused as a child, although she did not elaborate.
>
> Similarly, Dr. Burch testified that appellant's mother was a very abusive parent. Dr. Burch also testified that appellant's relationship with his mother was ambivalent, and it seemed that he was "pampered, but also abused later on." Further, Dr. Burch mentioned "an allegation by one of the sisters that in one of the foster placements she believed that there may have been some sexual abuse."
>
> Considerable evidence was introduced about parental abuse and neglect for the jury's consideration. The record does not support appellant's speculation that his counsel failed to present other available evidence to the jury about the conditions of his upbringing. Indeed, appellant did not mention any abuse during his unsworn statement. Thus, " 'it may be * * * that counsel conducted a diligent investigation, but [were] unable to find [more] substantial mitigation evidence.' " *State v. Otte,* 74 Ohio St.3d at 566, 660 N.E.2d 711, quoting *State v. Hutton* (1990), 53 Ohio St.3d 36, 42, 559 N.E.2d 432*.* Accordingly, we reject this claim.

*Hanna,* 95 Ohio St.3d at 306-07.

Patricia Cutcher, Mr. Hanna's sister, testified at the trial that Mr. Hanna and his eight siblings grew up in a house without plumbing, only two of the children graduated from high school, their father died in 1956, their mother was a harsh disciplinarian who would use anything she could pick up for discipline such as a shoe, a Hoover wand, and willow switches, and that when Ms. Cutcher was about twelve years-old, her mother broke Ms. Cutcher's nose. Transcript., Vol. X at 1520-39. Ms. Cutcher also testified that her two brothers, including Mr. Hanna, got into trouble and had no supervision, that Mr. Hanna was subjected to sexual abuse growing up, and that Mr. Hanna was placed in foster care more than twice while growing up. *Id.*

Dr. Burch testified that Mr. Hanna's family was very poor when he was growing up to the point of living in an Army surplus tent for several years, his mother was rather aggressive and abusive toward the children to the point of beatings administered with a vacuum cleaner pipe and a "donut board", there was a lot of humiliation and very, very inconsistent and hostile treatment of the children, that there was questionable supervision, and that there was some neglect substantiated at one point. *Id.* at 1547-55. Dr. Burch also testified that there were reports from Mr. Hanna's sisters about extremely different attitudes on the part of the mother toward her female children and her male children, Mr. Hanna was the mother's "favorite", Mr. Hanna did not get a haircut until he was five years old and that when people though that he was a girl, his mother would pull down his pants to prove he was a boy, his relationship with his mother was ambivalent at best, he was pampered but also abused later on, and that his mother overprotected him in the sense of not allowing him to accept responsibility or make him responsible for any of his behaviors but that she also treated him in a humiliating and overly controlling fashion. *Id.* Dr. Burch testified further that there were allegations by family members that Mr. Hanna was sexually abused by a neighbor, there

were allegations by one of his sisters that Mr. Hanna may have been sexually abused while he was in foster placement but that the allegation was not substantiated. *Id.*

As noted above, Mr. Hanna claims that counsel were ineffective for failing to interview or properly interview his sisters Nancy LaDuke and Beverly Whitney and his brother Willard Hanna. Mr. Hanna relies on affidavits provided by his siblings during his post-conviction proceedings to support his claim.

Ms. LaDuke testified in her December 17, 1999, affidavit that when she and her siblings were growing up, their mother was the disciplinarian who whipped the children with whatever items she could get her hands on including a "donut board" and a vacuum handle, that Mr. Hanna was placed in foster care, and that Mr. Hanna told her that while he was in foster care, he was sexually abused by the male foster parent. Appendix, Vol. IX at 271-72.

Ms. Whitney testified in her December 17, 1999, affidavit that their mother was very strict and often hit them with belts and boards, only two of the children graduated from high school, the family was very poor, Mr. Hanna had problems in school although she did not know what they were, one time when their mother found Mr. Hanna smoking a cigarette she made him chew tobacco and it made him very ill, and that both of her brothers spent time in the Child Studies Institute. *Id.* at 273-74.

Mr. Willard Hanna testified in his December 17, 1999, affidavit that when their father was alive, the family would go on weekly outings such as to the zoo or a park, their mother was the primary disciplinarian who would whip the children with whatever she could get her hands on such as a vacuum handle, a wood panel, and a belt, one time she hit Mr. Hanna very hard in his eye and hit him with a garden rake, and that Mr. Hanna was arrested for robbing a store when he was 15 years old and he was sentenced to eighteen months in jail. *Id.* at 269-70.

Although Mr. Hanna points to his siblings' proposed testimony, he has not identified any information in the affidavit testimony that would provide to the jury information that was not provided by his sister Patricia Cutcher or Dr. Burch. If anything, the testimony from Ms. LaDuke, Ms. Whitney, and Mr. Willard Hanna would have been cumulative.

Finally, Mr. Hanna has failed to show how the result of his trial would have been different if his siblings had testified at his trial. In other words, Mr. Hanna has again failed to satisfy the "prejudice" prong of *Strickland*.

The Ohio courts' conclusion as to the claims Mr. Hanna raises in his Fourth Ground for Relief were not contrary to or an unreasonable application of clearly established federal law and therefore and Mr. Hanna's Fourth Ground for Relief should be rejected.

### Fifth Ground for Relief

**Petitioner Hanna was denied his rights to a fair trial in the trial phase of his capital trial because his counsel's performance fell below constitutional standards and Hanna suffered prejudice.**

**A. Trial Counsel failed to ascertain during *voir dire* whether Juror Reeves was competent under Ohio law to serve on a jury.**

**B. Trial Counsel were ineffective when they failed to question Juror Reeves about his prison experiences to determine whether he could be a fair juror at Petitioner Hanna's trial which involved [ ] a killing in prison.**

**C. Trial Counsel were ineffective because they failed to re-raise their motion that the prosecutor's file be copied and sealed for appellate review.**

**D. Trial counsel were ineffective for failing to point out the inconsistencies in the testimony of the prosecution's medical experts.**

In his Fifth Ground for Relief, Mr. Hanna alleges that his trial counsel were

ineffective when they failed to ascertain that Juror Reeves was an incompetent juror under Ohio law, failed to inquire as to Juror Reeves' prison experience and whether he could be a fair juror, failed to again move the trial court to copy and seal the prosecutor's file for appellate review, and failed to cross-examine Dr. Katz.

In considering Mr. Hanna's Fourth Ground for Relief, this Court discussed the ineffective assistance of counsel standard set forth in *Strickland*. The *Strickland* standard is, of course, applicable to Mr. Hanna's Fifth Claim for Relief.

## Subclaims "A" and "B"

The claims that Mr. Hanna raises in subclaims "A" and "B" of his Fifth Ground for Relief are intertwined with the claim with respect to Juror Reeves which Mr. Hanna raised in his First Ground for Relief. The post-conviction court of appeals was the last state court to consider this claim and it rejected it saying:

> Appellant next argues that he received ineffective assistance of counsel during voir dire. This argument is also without merit because it is barred by *res judicata*. *Res judicata* is a proper basis upon which to dismiss a PCR petition without a hearing. *State v. Perry* (1967), 10 Ohio St. 2d 175, 179, 226 N.E.2d 104. The doctrine of *res judicata* applies to constitutional issues that have or could have been raised previously. *Id*. at paragraph seven of the syllabus. This includes claims of ineffective assistance of counsel. *State v. Cole* (1982), 2 Ohio St. 3d 112, 443 N.E.2d 169, syllabus.

> The presentation of competent, relevant, and material evidence outside the record may defeat the application of *res judicata*. *State v. Smith* (1997), 125 Ohio App. 3d 342, 348, 708 N.E.2d 739. However, to overcome the *res judicata* bar, evidence offered outside the record "must demonstrate that [appellant] could not have appealed the constitutional claim based upon information in the original record." *State v. Lawson* (1995), 103 Ohio App. 3d 307, 315, 659 N.E.2d *362*, citing *State v. Franklin,* 1995 Ohio App. LEXIS 183 at *9 (Jan. 25, 1995) Hamilton App. No. C-930760, unreported. If the evidence outside the record is "marginally significant and does not advance the petitioner's claim beyond a mere hypothesis and a desire

for further discovery," *res judicata* still applies to bar the claim. *Id*.

Appellant contends that he could not effectively argue his ineffective assistance of counsel claim addressing the voir dire conducted by trial counsel without an affidavit provided by David L. Doughten, an attorney. Therefore, appellant argues that Doughten's affidavit is evidence outside the record sufficient to immunize his claim from dismissal on the grounds of *res judicata*.

At the outset, we note that some Ohio appellate courts have held that affidavits of capital defense attorneys or experts reviewing the record of capital cases cannot be considered, as they are not evidence outside the record. See *State v. Landrum,* 1999 Ohio App. LEXIS 71 (Jan. 11, 1999) Ross App. No. 98 CA 2401, unreported; *State v. Zuern,* 1991 Ohio App. LEXIS 5733 (Dec. 4, 1991) Hamilton App. Nos. C-900481 and C-910229, unreported. By contrast, this court has considered such affidavits as evidence to support a claim of ineffective assistance of counsel in a postconviction relief proceeding. See *State v. Reeder,* 2000 Ohio App. LEXIS 5239 (Nov. 13, 2000) Clinton App. No. CA00-03-010, unreported. Although this court did not specifically find, as it was not argued, that the affidavit was competent evidence outside the record, it did find that the affidavit, along with three other documents, set forth sufficient operative facts to require an evidentiary hearing. 2000 Ohio App. LEXIS 5239 at *6.

The voir dire conducted by appellant's counsel is part of the record; therefore, appellant could have appealed this constitutional claim based upon information in the record. Further, even considering Doughten's affidavit, we find that appellant has failed to demonstrate that his trial counsel breached any essential duty owed to appellant or presented sufficient operative facts to require an evidentiary hearing. The attorney expert's affidavit has the benefit of hindsight, and a "fair assessment of attorney performance requires us to eliminate the distorting effect of hindsight." *State v. Post* 32 Ohio St. 3d 380, 388, 513 N.E.2d 754 (1987). The evidence outside the record is only marginally significant and does not advance the petitioner's claim beyond a mere hypothesis and a desire for further discovery. Consequently, *res judicata* operates to bar the claim.

*Hanna,* 2002 WL 4529 at *5-6.

   This Court again notes that, absent cause and prejudice, a federal habeas petitioner

who fails to comply with a state's rules of procedure waives his right to federal habeas corpus

review. See, *e.g., Boyle,* 201 F.3d at 716.

Ohio's doctrine of *res judicata* provides, in relevant part, that a final judgment of conviction bars a convicted defendant from raising in any proceeding, except an appeal from that judgment, any issue that was raised, or could have been raised, at trial or on appeal from that judgment. *Williams v. Bagley,* 380 F.3d 932, 967 (6th Cir. 2004), *cert. denied sub nom., Williams v. Bradshaw,* 544 U.S. 1003 (2005), *citing State v. Perry*, 10 Ohio St.2d 175 (1967). With respect to a procedural default analysis, Ohio's doctrine of *res judicata* is an adequate and independent state procedural ground. *Williams, citing Monzo v. Edwards,* 281 F.3d 568, 577 (6th Cir. 2002). Further, the Sixth Circuit has rejected claims that Ohio has failed to apply the doctrine of *res judicata* consistently. *Williams, citing Greer v. Mitchell,* 264 F.3d 663, 673 (6th Cir. 2001), *cert. denied,* 535 U.S. 940 (2002).

The court of appeals clearly applied the doctrine of *res judicata* in rejecting Mr. Hanna's claim. That court determined that Mr. Hanna could have raised this *voir dire* on direct appeal, yet failed to do so. This Court, therefore, concludes that subclaims "A" and "B" contained in Mr. Hanna's Fifth Ground for Relief are procedurally defaulted. However, even assuming those subclaims are not procedurally defaulted, they are without merit.

As noted above, claims of ineffective assistance of counsel are governed by *Strickland,* 466 U.S. at 689-94. As also noted above, *Strickland* provides, *inter alia,* that the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* Assuming Mr. Hanna's trial counsel were ineffective in the ways he alleges in subclaims "A" and "B", Mr. Hanna has failed to satisfy the second prong of *Strickland.* Specifically, this Court concluded that Mr. Hanna's First Ground for Relief is procedurally defaulted but nevertheless without merit. Because the underlying

claim with respect to subclaims "A" and "B" is without merit, it follows, then, that any claim of ineffective assistance of counsel claim based on that underlying claim is without merit.

### Subclaim "C"

In Subclaim "C" of his Fifth Ground for Relief, Mr. Hanna claims that his trial counsel were ineffective because they failed to renew their motion to copy and seal the prosecutor's file for appellate review.

Mr. Hanna raised this claim on direct appeal and the Ohio Supreme Court considered and rejected it as follows:

> Appellant also asserts that his counsel were ineffective by failing to again move to seal the prosecutor's file. We held in regard to appellant's eighth proposition of law that the trial court committed no error by refusing to seal the prosecutor's file. Moreover, appellant's claim that the prosecution withheld other exculpatory evidence is purely speculative. Thus, this claim has no merit.

*Hanna,* 95 Ohio St.3d at 304.[6]

This claim of ineffective assistance of counsel revolves around the *Brady* claim Mr. Hanna raised in his Third Ground for Relief. In other words, Mr. Hanna alleges that the prosecutor's file contained Trooper Ertel's investigative file which, according to Mr. Hanna, contained exculpatory evidence. However, as noted in the Court's analysis of Mr. Hanna's Third Ground for Relief, his *Brady* claims are without merit. Because the claims underlying Mr. Hanna's ineffective assistance claim in Subclaim "C" are meritless, it follows that his ineffective assistance claim also fails.

### Subclaim "D"

---

[6] Mr. Hanna arguably raised this claim in his post-conviction proceedings. However, it was in the context of a "cumulative error" claim. See *Hanna,* 2002 WL 4529 at *7-8.

In this subclaim, Mr. Hanna alleges that his trial counsel were ineffective for failing to cross-examine Dr. Steven Katz, an ophthalmologist at the Ohio State University Hospital, and Dr. James McWeeney, Medical Director at Lebanon and Warren Correctional Institutions, both of whom treated Mr. Copas after Mr. Hanna attacked him.

Mr. Hanna raised this claim on direct appeal and the Ohio Supreme Court rejected it stating:

> Appellant argues that his counsel were ineffective in their cross-examination of Dr. Katz and Dr. McWeeney, the state's medical experts.
>
> This court has recognized that " 'trial counsel need not cross- examine every witness * * *. The strategic decision not to cross-examine witnesses is firmly committed to trial counsel's judgment * * *.' " *State v. Campbell,* 90 Ohio St.3d at 339, 738 N.E.2d 1178, quoting *State v. Otte* (1996), 74 Ohio St.3d 555, 565, 660 N.E.2d 711.
>
> First, appellant argues that his counsel were ineffective for failing to bring out inconsistencies in Dr. Katz's testimony about Copas's numbness. On direct examination Dr. Katz testified that "tingling and numbness in his * * * face" were two of several medical findings that led him to request a CAT scan. Subsequently, however, Dr. Katz mentioned that the absence of any "weakness or tingling or numbness in [Copas's] body" was a reason why the "average ophthalmologist" or "average emergency room physician" might not have ordered a CAT scan.
>
> Appellant does not explain how his attorneys' failure to highlight Dr. Katz's inconsistencies made a difference in the outcome of his case. According to Dr. Katz, the absence of numbness was only one of several factors that might explain why an average emergency room doctor did not order a CAT scan. If challenged, Dr. Katz likely would have corrected his misstatement about numbness and clarified his testimony. However, it is unclear whether Dr. Katz's clarification would have worked in appellant's favor.
>
> Thus, counsel could decide to forgo further cross-examination to avoid the danger of reinforcing the state's evidence (i.e., numbness as only one factor) and clarifying expert testimony that might not come out in appellant's favor (i.e., numbness as a subtlety that might be overlooked). Moreover, the jurors heard Dr. Katz's testimony, and

they could evaluate his inconsistencies during their deliberations. We find that appellant's attorneys made a legitimate "tactical decision" and were not ineffective. *State v. Bradley,* 42 Ohio St.3d at 144, 538 N.E.2d 373.

Second, appellant contends that his counsel were ineffective by failing to cross-examine Dr. McWeeney on the implications of Copas's numbness. Dr. McWeeney testified that Copas told him on August 23 that "he felt his face was numb at times." Thus, appellant argues that his counsel should have challenged Dr. McWeeney's failure to order a CAT scan in view of Dr. Katz's testimony about numbness of the face.

Appellant has not demonstrated how further cross-examination of Dr. McWeeney would have made a difference in his case. In fact, Dr. McWeeney testified that he ordered a CAT scan of Copas's head because of his "traumatic facial injuries." Counsel made a legitimate "tactical decision" on the scope of cross-examination, and we reject this claim.

*Hanna,* 95 Ohio St.3d at 304-05.

Essentially, Mr. Hanna's position is that his counsel were ineffective with respect to their examinations of Dr. Katz and Dr. McWeeney because their sole defense for him (Mr. Hanna) was that Mr. Copas died due to medical negligence and their failures went directly to that defense.

First, as noted in the Court's analysis of Mr. Hanna's Seventh Ground for Relief, *infra*, medical negligence was not a proper issue for consideration in this case. Secondly, and perhaps more importantly, as he failed to do on direct appeal, Mr. Hanna has not demonstrated how counsels' failure to cross-examine Dr. McWeeney or further cross-examine Dr. Katz affected the ultimate outcome of the trial. Stated differently, Mr. Hanna has not shown how he was prejudiced by any alleged ineffective assistance of counsel as required by *Strickland.* The state court's decision under *Strickland* was therefore not an objectively unreasonable application of that precedent.

The claims that Mr. Hanna raises in his Fifth Ground for Relief are either procedurally defaulted or without merit and therefore the Fifth Ground should be denied.

### Sixth and Seventh Grounds for Relief

Mr. Hanna raises jury instruction claims in his Sixth and Seventh Grounds for Relief.

Federal habeas corpus is available only to correct federal constitutional violations. 18 U.S.C. § 2254(a); *Lewis v. Jeffers,* 497 U.S. 764, 780 (1990); *Smith v. Phillips,* 455 U.S. 209, 211 (1982); *Barclay v. Florida,* 462 U.S. 939, 957 (1983).  "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991).

In order for habeas relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous, or universally condemned; taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair.  *Henderson v. Kibbe,* 431 U.S. 145, 154 (1977).  The only question for a habeas court to consider is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process".  *Estelle, supra.*  The category of infractions that violate fundamental fairness is very narrow.  *Byrd v. Collins,* 209 F.3d 486 (6th Cir. 2000), citing *Dowling v. United States,* 493 U.S. 342, 352 (1990). Because jury instructions are typically matters of state law, the standard for demonstrating that an error in jury instruction caused constitutional error in a habeas proceeding is even greater than the showing required to establish plain error on direct appeal.  See *Henderson,* 431 U.S. at 154; see also, *Scott v. Mitchell,* 209 F.3d 854, 882 (6th Cir. 2000).

### Sixth Ground for Relief

**The jury instruction on causation and foreseeability given in this case shifted the burden of proof on the mens rea element of the**

**offense to the accused and reduced the State's burden of proof in violation [of] the Due Process Clause of the Fourteenth Amendment to the United States Constitution.**

In his Sixth Ground for Relief, Mr. Hanna argues that the trial court improperly instructed the jury on the issues of causation and foreseeability. Mr. Hanna's position is that the complained-of instruction weakened the State's burden of proof on the elements of purpose and prior calculation and design which the jury had to find in order to convict him of aggravated murder. Mr. Hanna claims that it is the unique facts of this case that make the instruction so prejudicial because the manner in which Mr. Copas died was not the immediate and most obvious result of his (Mr. Hanna's) act.

Mr. Hanna raised this claim on direct appeal and the Ohio Supreme Court rejected it, explaining:

> In his seventh proposition of law, appellant contends that the instructions defining causation in terms of foreseeability undermined the burden of proof on the mens rea element of the aggravated murder charge. See *State v. Burchfield* (1993), 66 Ohio St.3d 261, 263, 611 N.E.2d 819. Appellant objects to the following jury instruction: "The defendant's responsibility is not limited to the immediate or most obvious result of the defendant's act. The defendant is also responsible for the natural and foreseeable results that follow, in the ordinary course of events, from the act."
>
> We have recognized that the use of the foreseeability instruction in aggravated murder cases is questionable. See *Burchfield,* 66 Ohio St.3d at 263, 611 N.E.2d 819; *State v. Goodwin* (1999), 84 Ohio St.3d 331, 346, 703 N.E.2d 1251. However, "the use of that instruction * * * does not require reversal where the instructions as a whole make clear that the jury must find purpose to kill in order to convict." *State v. Phillips,* 74 Ohio St.3d at 100, 656 N.E.2d 643. Accord *State v. Frazier* (1995), 73 Ohio St.3d 323, 331, 652 N.E.2d 1000.
>
> In the case sub judice, the trial court provided the jury with extensive instructions on the state's burden of proof and the requirement to prove purpose to kill both before and after the foreseeability instruction was given to the jury. Thus, the instructions as a whole

made clear that the jury was required to find purpose to kill in order to convict. See *Phillips,* 74 Ohio St.3d at 100, 656 N.E.2d 643. We find no prejudicial error and reject appellant's seventh proposition.

*Hanna,* 95 Ohio St.3d at 295.

An instruction on foreseeability of death as a result of conduct is permissible in a capital case when combined with a specific intent instruction. *Byrd*, 209 F.3d at 527.

The trial court instructed the jury as follows:

The defendant, James G. Hanna, is charged with aggravated murder. Aggravated murder is purposely causing the death of another with prior calculation and design. Before you can find the defendant guilty of aggravated murder, you must find beyond a reasonable doubt that on or about August 22, 1997, and in Warren County, Ohio, the defendant purposely caused the death of Peter Copas with prior calculation and design.

Purposely. A person acts purposely when it is his specific intent to cause a certain result. It must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to cause the death of Peter Copas.

Purpose is a decision of the mind to do an act with a conscious objective of purposely producing a specific result. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself, unless he expresses it to others or indicates it by his conduct.

How determined. The purpose with which a person does an act is determined from the manner in which it is done, the weapon used and all other facts and circumstances in evidence.
...

Specific intent. No person may be convicted of aggravated murder unless he specifically intended to cause the death of another.

Prior calculation and design. This means that the purpose to cause the death was reached by a definite process of reasoning in advance of the homicide, which process of reasoning must have included a mental plan involving studied consideration of the method and means with which to cause the death of another.

72

To constitute prior calculation and design, there must have been sufficient time and opportunity for the planning of an act of homicide, and the circumstances surrounding the homicide must show a scheme designed to carry out the calculated decision to cause the death. No definite period of time must elapse and no particular amount of consideration must be given, but acting on the spur of the moment or after momentary consideration to cause the death is not sufficient.

Causation. The State charges that the act of the defendant caused the death of Peter Copas. Cause is an act which in a natural and continuous sequence directly produced the death of Peter Copas and without which it would not have occurred.

The defendant's responsibility is not limited to the immediate or most obvious result of the defendant's act. The Defendant is also responsible for the natural and foreseeable results that follow, in the ordinary course of events, from the act.

Other causes not a defense. There may be one or more causes of an event. However, if a defendant's act was one cause, then the existence of other causes in not a defense.

Intervening causes. The defendant is responsible for the natural consequences of the defendant's unlawful act, even though death was also caused by the intervening act of another person or agency.

Independent intervening cause of death. If the defendant inflicted an injury not likely to produce death, and if the sole and only cause of death was something else or someone else, the defendant who inflicted the original injury is not responsible for the death.
...

Transcript, Vol. IX at 1456-60.

As noted above, Mr. Hanna alleges that the trial court's instruction weakened the State's burden of proof on the elements of purpose and prior calculation and design.

First, as the Respondent noted, the court's instruction does not indicate that Mr. Hanna must prove anything nor disprove any element of the crime with which he was charged. Additionally, in addition to the instruction about which Mr. Hanna complains, the trial court

instructed the jury that: (1) it was required to find beyond a reasonable doubt that Mr. Hanna "*purposely caused* the death of Peter Copas with prior calculation and design"; (2) a person acts purposely when it is his *specific intent* to cause a certain result; (3) purpose is a decision of the mind to do an act with a conscious objective of *purposely* producing a specific result; (4) to do an act purposely is to do it *intentionally and not accidentally*; (5) no person may be convicted of aggravated murder unless he *specifically intended* to cause the death of another; and (6) prior calculation and design means that the purpose to cause the death was reached by a *definite process of reasoning* in advance of the homicide.

When viewing the instructions in their entirety, the trial court did not tell the jury that it must define cause solely on the foreseeability of the results of Mr. Hanna's acts. The court repeatedly instructed the jury of the need to find that Mr. Hanna acted with the specific intention to cause Mr. Copas' death. In other words, in view of the trial court's instructions as to "purposely causing" and "specific intent", the instructions on causation and foreseeability did not undermine the requirement of specific intent. This Court concludes that the trial court properly instructed the jury with respect to the specific intent requirement for aggravated murder and did not impermissibly lower the burden of proof by also instructing the jury on foreseeability . Mr. Hanna has not shown that fundamental unfairness resulted from the trial court's instruction such that his due process rights were violated.

The Ohio Supreme Court's conclusion as to this claim was not contrary to or an unreasonable application of clearly established federal law and therefore and Mr. Hanna's Seventh Ground for Relief should be rejected.

## Seventh Ground for Relief

**The trial court's failure to instruct the jury as to when medical malpractice may constitute an independent intervening cause denied Petitioner Hanna his right to present a defense and a fair trial in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.**

Mr. Hanna argues in his Seventh Ground for Relief that the trial court erred by failing to give to the jury his requested instruction as to when medical malpractice may constitute an independent, intervening cause. The thrust of Mr. Hanna's argument is that by failing to give the jury the requested instruction on intervening cause, his constitutional rights were violated because the trial court prevented the jury from considering "an important aspect of the defense case." Mr. Hanna's position seems to be that the jury should have been permitted to consider whether medical malpractice was 'a' or 'the' cause of Mr. Copas' death rather than Mr. Hanna's admitted act of plunging the paintbrush shank into Mr. Copas' eye.

The Ohio Supreme Court addressed this claim on direct appeal as follows:

In his second proposition of law, appellant argues that the trial court erred in rejecting his proposed instruction on medical malpractice as an independent cause of death.

Generally, "one who inflicts injury upon another is criminally responsible for that person's death, regardless of whether different or more skillful medical treatment may have saved his life." *State v. Johnson* (1978), 56 Ohio St.2d 35, 40, 10 O.O.3d 78, 381 N.E.2d 637. Moreover, "medical treatment for homicide victims is not an intervening cause." *State v. Carter* (1992), 64 Ohio St.3d 218, 226, 594 N.E.2d 595. "Only gross negligence or willful maltreatment will relieve the defendant from liability. Simple negligence is not enough." (citation omitted.) *State v. Beaver* (1997), 119 Ohio App.3d 385, 394, 695 N.E.2d 332. See, also, Annotation, Homicide: Liability Where Death Immediately Results from Treatment or Mistreatment of Injury Inflicted by Defendant (1997), 50 A.L.R.5th 467.

Appellant proposed the following jury instruction on intervening cause, relying on *Johnson,* 56 Ohio St.2d at 40, 10 O.O.3d 78, 381 N.E.2d 637: "One who inflicts injury upon another is criminally responsible for that person's death, regardless of whether different or more skillful medical treatment may have saved his life. This rule has

been qualified where there has been a gross or willful maltreatment of the patient by the medical personnel which is shown to have been an independent intervening cause of the patient's death." (Citations omitted.)

The trial court refused to give the proffered instruction. The court stated that the issue was "sufficiently covered" and found the proposed instruction to be "duplicative at best and confusing at worst." Rather, the trial court provided jury instructions on intervening cause and independent intervening cause based on 4 Ohio Jury Instructions ("OJI"), Section 409.56, as follows:

"Intervening causes. The defendant is responsible for the natural consequences of the defendant's unlawful act, even though death was also caused by the intervening act of another person or agency."

"Independent intervening cause of death. If the defendant inflicted an injury not likely to produce death, and if the sole and only cause of death was something else or someone else, the defendant who inflicted the original injury is not responsible for the death."

Appellant was not entitled to his instruction on independent intervening cause. First, the trial court provided adequate instructions from OJI on intervening cause and independent intervening cause of death.

Second, there was no evidence that Copas was the victim of gross or willful maltreatment. There were no clinical symptoms of neurological damage when Dr. Talkers treated Copas. The patient was wide awake and talking, and Copas was observed in the emergency room and never lost consciousness. Based upon these observations and the history provided to him by Copas, Dr. Talkers concluded that a CAT scan was not warranted. Even though defense experts testified that Dr. Talkers breached the standard of care by not ordering a CAT scan, the evidence at most is conflicting on this point and would not support a finding of gross negligence or willful maltreatment. Cf. *Cook v. Foltz* (C.A.6, 1987), 814 F.2d 1109, 1113 (not entitled to instruction on grossly erroneous medical treatment where the record did not support such a claim).

Finally, the coroner's testimony established that appellant's attack was the cause of Copas's death. According to Dr. Norton, the deputy coroner, "the penetrating injury to the head, the instrument going in is what caused death." Indeed, Dr. Janiak, the defense expert, concurred in the coroner's findings. He stated that, "clearly the foreign body was responsible for multiple problems that ensued" with the victim. Therefore, we find that the trial court did not err by rejecting appellant's proposed jury instruction. We reject appellant's

second proposition.

*Hanna,* 95 Ohio St.3d at 293-95.

Unlike the situation in *Crane v. Kentucky,* 476 U.S. 683 (1986), on which Mr. Hanna relies in part in support of this Ground, Mr. Hanna is not arguing that the trial court prevented him from presenting evidence which was allegedly necessary to his defense. In fact, Mr. Hanna did introduce medical evidence as to the cause of Mr. Copas' death. Indeed, Mr. Hanna's own expert witness, neurosurgeon Dr. Paul Schwetschenau essentially testified that the paintbrush shank which Mr. Hanna stabbed into Mr. Copas' eye socket and which entered his brain caused Mr. Copas' death. Transcript, Vol. VIII at 1329-51.

Mr. Hanna requested the trial court give an instruction to the jury which addressed the "gross or willful maltreatment of the patient by the medical personnel". However, as the Ohio Supreme Court noted, there was absolutely no evidence introduced at trial that there was any gross or willful maltreatment of Mr. Copas by the medical personnel who attended him. Mr. Hanna's position seems to be that if the physicians who initially treated Mr. Copas had obtained additional medical tests, specifically a CT scan, they would have discovered the presence of the paintbrush shank in Mr. Copas' brain, removed it, and prevented his death. Presumably, Mr. Hanna's position is that this failure was gross or willful maltreatment by the medical personnel.

Mr. Hanna presented to the jury the videotaped testimony of his expert, emergency physician Dr. Bruce Janiak. Dr. Janiak testified that in his opinion, the medical personnel who treated Mr. Copas did not meet the standard of care. Transcript Vol. II (Bruce D. Janiak, M.D., Videotape Deposition, Oct. 22, 1998). Even assuming that there was medical malpractice or negligence as Dr. Janiak suggested, there is absolutely no evidence of gross or willful maltreatment of Mr. Copas. In other words, even Mr. Hanna's own expert, Dr. Janiak, did not testify that any of

the medical personnel who treated Mr. Copas *intentionally* did something that was wrong or *intentionally* failed to do something that should have been done. *See* 1 O.J.I. 7.90 ("Willful or Wanton Misconduct"). Nor did Dr. Janiak testify that any of the medical personnel who cared for Mr. Copas failed to exercise any degree of care at all nor exercise such a slight degree of care as to show total disregard for Mr. Copas. *See Prestion v. Murty,* 32 Ohio St.3d 334, 335 (1987) (defining gross negligence).

As the Ohio Supreme Court determined as a matter of state law, not only was Mr. Hanna not entitled to have the trial court instruct the jury as he requested, there is nothing in the record, particularly in view of the above-referenced testimony from Mr. Hanna's own experts, Drs. Schwetschenau and Janiak, which supports a conclusion that the trial court's failure to give the requested instruction so infected Mr. Hanna's entire trial that his resulting conviction violates due process.

As with Mr. Hanna's jury instruction claim in his Sixth Ground for Relief, the Ohio Supreme Court's decision as to the claim in this Ground was not contrary to or an unreasonable application of clearly established federal law. Therefore, Mr. Hanna's Seventh Ground for Relief should be rejected.

## Eighth Ground for Relief

**The preclusion of Petitioner Hanna's proffered evidence as to the prevalence of "shanks" in the prison system was a violation of Hanna's Due Process rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution**.

In this claim, Mr. Hanna argues that, during the guilt phase of his capital trial, he should have been allowed to introduce evidence as to the prevalence of prisoners having possession

of "shanks" in prison[7].  His position is that the trial court's refusal to allow him to introduce that evidence resulted in a violation of his due process rights.

The Ohio Supreme Court addressed this claim on direct appeal and said:

In his first proposition of law, appellant claims that the trial court erred by refusing to allow LCI Warden Harry Russell's testimony about shanks or weapons confiscated at the prison and the charges filed against inmates for possessing such weapons. Appellant asserts that this information would show that prisoners' possession of weapons is common and does not indicate intent to kill. In support, at trial, appellant proffered an exhibit "concerning the number of shanks and other weapons at LCI that have been confiscated" and "charges that were filed in relation to possession and use of those items." The trial court rejected the warden's testimony, finding that it was not relevant and that its probative value was outweighed by its prejudicial impact.

The admission of Warden Russell's testimony rested upon a question of relevancy. Evid.R. 401 provides, "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. See *State v. Sage* (1987), 31 Ohio St.3d 173, 180, 31 OBR 375, 510 N.E.2d 343.

Evid.R. 403(A) provides: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, or confusion of the issues, or of misleading the jury." When considering evidence under Evid.R. 403, the trial court is vested with broad discretion, and an appellate court should not interfere absent a clear abuse of discretion. *State v. Allen* (1995), 73 Ohio St.3d 626, 633, 653 N.E.2d 675, citing *State v. Morales* (1987), 32 Ohio St.3d 252, 257-258, 513 N.E.2d 267.

The trial court could legitimately conclude that the warden's testimony focused on side issues (e.g., prison administration, inmate discipline, and inmate violence) substantially unrelated and prejudicial to a fair resolution of the issues in this case. Thus, we find no abuse of discretion in excluding Warden Russell's testimony.

---

[7] A shank is a homemade knife or hand weapon. See *Donald v. Marshall*, No. 84-3231, 1985WL13183 at *1 (6th Cir., Apr. 5, 1985),

*Hanna*, 95 Ohio St.3d at 290-91.

As noted above, federal habeas corpus is available only to correct federal constitutional violations,  28 U.S.C. §2254(a); *Lewis*, 497 U.S.  at  780 (1990); *Smith*, 455 U.S. at 221;  *Barclay,* 463 U.S. at 957, and it is not the province of a federal habeas court to reexamine state court determinations on state law questions. *Estelle*, 502 U.S. at 67-68.

Evidentiary questions generally do not rise to the constitutional level unless the error was so prejudicial as to deprive a defendant of a fair trial.  *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988);  *Walker v. Engle,* 703 F.2d 959, 962 (6th Cir.), *cert. denied,* 464 U.S. 951 (1980); *Bell v. Arn,* 536 F.2d 123 (6th Cir., 1976); *Burks v. Egeler*, 512 F.2d 221, 223 (6th Cir.), *cert. denied,* 423 U.S. 937 (1975).  "We have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability–even if the defendant would prefer to see the evidence admitted." *Crane v. Kentucky,* 476 U.S. 683, 690 (1986).  Where an evidentiary error is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief.  *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir.), *cert. denied sub nom, Bugh v. Bradshaw*, 540 U.S. 930 (2003), *citing Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir.), *cert. denied,* 534 U.S. 977 (2001).  Courts have, however, defined the category of infractions that violate fundamental fairness very narrowly. *Bugh,* 329 F.3d at 512*, quoting Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993), *quoting Dowling v. United States*, 493 U.S. 342, 352 (1990).  "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Bugh,* 329 F.3d 496 at 512, *citing, Seymour v. Walker*, 224 F. 3rd 542, 552 (6th Cir. 2000), *cert. denied,* 532 U.S. 989 (2001) (*quoting Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).  The Supreme Court has defined very

narrowly the category of infractions that violate fundamental fairness. *Bey v. Bagley*, 500 F.3d 514 (6th Cir. 2007), *citing Dowling v. United States*, 493 U.S. 342, 352 (1990). To warrant habeas relief, the excluded evidence must "eviscerate" the defendant's defense. *Alley v. Bell,* 307 F.3d 380, 395 (6th Cir. 2002), *cert. denied,* 540 U.S. 839 (2003).

Mr. Hanna argues that the trial court erred by not allowing testimony about the prevalence of prisoners having possession of shanks because such testimony would have shown that it was common practice among prisoners to possess shanks and therefore, his possession of one failed to show that he acted with prior calculation and design. Mr. Hanna alleges that in his closing argument, the prosecutor argued that the type of weapon Mr. Hanna used, *i.e.,* a shank, established prior calculation and design.

During his closing argument, the prosecutor said:

...

Ten to 15 minutes, ladies and gentlemen, for him to think there's a better way to deal with this inmate problem, there's a better way to deal with this cellmate problem. I can tell somebody else my problems. But, ladies and gentlemen, [during] those 10 to 15 minutes his actions demonstrated that he planned and intended to kill Peter Copas.

...

We also have to show prior calculation and design, And the defendant admitted that in the 15 minutes prior to this attack he had taken this brush and he had sharpened it. And he had burned it. And he had gotten gauze and put it around his hand. And that he'd also gotten a lock and put it in a sock. A backup, if you will. And he had thought about sticking the defendant in the eye instead of the ear. All he had was this brush and it wouldn't work in the ear. He thought about how he was going to kill him.

It doesn't take a grand scheme or a master plan to commit aggravated murder. Ladies and gentlemen, all it takes is 15 minutes of thought and preparation. And that's what we have in this case.

...

Transcript, Vol. IX at 1371; 1379-80.

During his rebuttal argument, the prosecutor said:

...

But how it applies in this case, ladies and gentlemen, for instance, the sufficient time judge said can't be a momentary consideration. We know it was hours in a locked cell. We know it involves steady consideration how he fashioned the weapon, he shortened the weapon, he tempered it with a match so it would be hard so it would help accomplish what he was setting out to do. That is also specific intent ... included a mental play.

He ... had to utilize what he had available to him. He didn't have, so to speak, lucky pick at this point. He had to use the paintbrush handle instead of something a little better under the circumstances and the circumstances surrounding, ladies and gentlemen, show that the scheme was designed to carry out the calculated decision.

*Id.* at 1444.

Contrary to Mr. Hanna's argument, the prosecutor did not argue, either in his closing argument or in his rebuttal, that the state had proven the element of prior calculation and design because it established that Mr. Hanna had possession of a shank. Rather, what the prosecutor argued was that the time it took Mr. Hanna to **fashion** the shank immediately before stabbing Mr. Copas in the eye was sufficient to establish prior calculation and design. In other words, the issue was not that Mr. Hanna possessed a shank. Rather, the issue was that Mr. Hanna spent the fifteen minutes before he stabbed Mr. Copas, making the weapon he intended to and did use. Any testimony as to the prevalence of prisoners having possession of shanks would be irrelevant to the issue of the time Mr. Hanna spent making a shank immediately before he stabbed Mr. Copas.

Even assuming that the trial court erred as a matter of state law, for the foregoing

reasons, this Court cannot say that such error would rise to the level of a constitutional due process violation.

Mr. Hanna's Eighth Ground for Relief should be rejected.

### **Ninth Ground for Relief**

**Execution by lethal injection represents cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution.**

In his Ninth Ground for Relief, Mr. Hanna argues that the death penalty as administered by lethal injection in Ohio is cruel and unusual punishment. Mr. Hanna does not specifically argue that the particular chemical protocol Ohio uses in administering lethal doses to death-sentenced inmates causes, or at least has the potential to cause, excruciating pain to the inmate. His challenge is to lethal injection in general.

Mr. Hanna raised this claim during his post-conviction proceedings. In rejecting the claim, the Warren County Court of Appeals said:

> Appellant's last argument under the first assignment of error is that his PCR petition should not have been dismissed because it presented sufficient operative facts supported by evidence outside the record that electrocution and lethal injection are cruel and unusual forms of punishment. On November 21, 2001, the Governor of Ohio signed Am.H.B. No. 362 which eliminates electrocution as an option for the execution of death sentence. Therefore, any person who has been sentenced to death must be executed by lethal injection. The Ohio Supreme Court has upheld the use of lethal injection, noting that no case law, federal or state, has held that method constitutes cruel and unusual punishment. *State v. Carter* (2000)*,* 89 Ohio St. 3d 593, 608, 734 N.E.2d 345.

*Hanna,* 2002 WL 5429 at *8; Appendix, Vol. VI at 225-43.

As Mr. Hanna and the Respondent both note, the United States Supreme Court said long ago that a method of execution will be cruel and unusual when it "involves torture or a

lingering death." *In re Kemmler,* 136 U.S. 436, 446 (1890). However, Mr. Hanna has not cited, nor has this Court found, any federal case that has held that lethal injection is cruel and unusual punishment in violation of the Eighth Amendment.

Lethal injection is used for capital punishment by the federal government and 36 states, 27 of which require lethal injection as the sole method of execution. *Baze v. Rees,* ___ U.S. ___, 128 S. Ct. 1520, 1526-27. (2008). *Baze* involved a specific challenge to Kentucky's lethal injection three-drug protocol which requires the administration of sodium thiopental, pancuronium bromide, and potassium chloride. *Baze,* ___ U.S. at ___, 128 S. Ct. at 1528. The Court held that Kentucky's challenged protocol does not violate the Eight Amendment's proscription against cruel and unusual punishment. See *Baze*, ___ U.S. at ___, 128 S.Ct. at 1520. Ohio's lethal injection protocol is the same as the protocol Kentucky uses. See *Cooey v. Strickland,* 479 F.3d 412, 414 (2007), *cert. denied*, ___ U.S. ___, 128 S. Ct. 2047 (2008).[8] It follows that if Kentucky's lethal injection protocol is not unconstitutional, neither is Ohio's identical protocol.

While Mr. Hanna has not brought a claim that Ohio's lethal injection protocol itself is unconstitutional, this Court finds *Baze* instructive with respect to Mr. Hanna's general claim of lethal injection unconstitutionality. In the absence of any federal law which finds that lethal injection is unconstitutional, and in light of *Baze*, this Court concludes that Mr. Hanna's Ninth Ground for Relief should be denied.

### Tenth Ground for Relief

**Petitioner Hanna's convictions and death sentence are invalid because the cumulative effect of the constitutional errors set forth in this Habeas Corpus Petition violated his rights under the Fifth,**

---

[8] On June 9, 2008, the United States Supreme Court denied a petition for rehearing in *Cooey*. ___ U.S. ___, 128 S. Ct. 2927 (2008).

**Sixth, Eighth, and Fourteenth Amendments.**

In this Ground for relief, Mr. Hanna essentially claims that the totality of the multiple constitutional violations which he alleges in his habeas Petition had a substantial and injurious effect on the fairness of the process that produced his conviction and death sentence.

The Constitution entitles a criminal defendant to a fair trial, not a perfect one. *Delaware v. VanArsdall*, 475 U.S. 673, 681 (1986). Indeed, there can be no such thing as an error-free, perfect trial. *United States v. Hastings,* 461 U.S. 499, 508-09 (1983).

The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief. *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002), *cert. denied,* 538 U.S. 947 (2003). "[W]e have held that, post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief." *Moore v. Parker,* 425 F.3d 250, 256 (6th Cir. 2005), citing *Scott v. Elo,* 302 F.3d 598, 607 (6th Cir. 2002), *cert. denied,* 537 U.S. 1192 (2003) and *Lorraine, supra.*

Assuming *arguendo* that Mr. Hanna's "cumulative error" claim is not procedurally defaulted, it is not cognizable in federal habeas. Therefore, the Tenth Ground for Relief should be rejected.

**Conclusion**

Mr. Hanna's Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254, (Doc. 10), should be denied. Judgment should be entered in favor of the Respondent and against the Petitioner, dismissing the Petition with prejudice.

December 18, 2008.

s/ **Michael R. Merz**
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).